162 So. 368

## WHITE v. WHITE.

### 1 Div. 862.

Supreme Court of Alabama.

May 9, 1935.

Rehearing Denied June 27, 1935.

John E. Adams, of Grove Hill, for appellant.

A. S. Johnson, of Thomasville, and Mallory & Mallory, of Selma, for appellee.

BROWN, Justice.

This appeal is from a decree of the probate court entered on December 27, 1933, passing and approving the accounts and vouchers of the appellee on the final settlement of his guardianship of the estate of the appellant, Vernon A. White, a person non compos mentis, and the case was submitted on the motion of the appellee to dismiss the appeal, and on the merits.

It appears from the record that the appeal was taken on the 24th of March, 1934; that the citation of appeal was issued on the 26th of March, 1934, and service thereof accepted by the appellee's attorney on the 28th of March, 1934; that the bill of exceptions was presented to and approved by the trial judge on March 24, 1934.

On the 18th of March, 1935, the appellee filed a certificate of the appeal, and a motion to dismiss.

The record was filed on March 30, 1935, and the case was submitted on the 2d day of April, 1935, at the first call of the division to which the case belongs after the motion to dismiss was made, and on the submission the appellant made proof by affidavit going to show that the delay in filing the record was occasioned by the delay in its completion until after the first of the year 1935, and was not delivered to appellant until the 18th of February, 1935.

Counteraffidavit was filed by appellee, but it is not made to appear that appellee has suffered detriment by the delay.

■ The appeal is by a non compos mentis, through his guardian ad litem, and the questions presented are in respect to the alleged mismanagement of his estate, and in view of the circumstances and the nature of the appeal, we are of opinion that the motion to dismiss should be denied and the case considered on its merits. Let this order be entered. Campbell v. Sowell, ante, p. 109, 159 So. 813.

In October, 1928, the exact date does not appear, appellee invested $12,139.35 of his ward's money in bonds issued by the Continental Mortgage Company, a private corporation, organized and existing under the laws of the state of North Carolina, with its home office in the city of Asheville. The sum paid for the bonds was par value with accrued interest. Some time later, appellee invested $3,000 of his ward's money in like bonds of the same corporation.

On the final settlement, the probate court, over the objection and protest of the guardian ad litem that said expenditures were unauthorized and against the public policy of this state as declared by section 74 of the Constitution of 1901, approved these expenditures and allowed the guardian credit therefor.

The guardian ad litem renews his objection and protest here.

The appellee offered evidence going to show that before the money of the ward was invested in said bonds, he had sought the advice and approval of the "Regional Attorney of the United States Veterans' Bureau of Birmingham, Alabama," as to whether it would approve an investment in "first mortgage bonds guaranteed by one of the large surety companies," and was advised that said "office does approve the purchase of such first mortgage bonds as mentioned in your letter. Such form of investment is permitted by the State law."

He also offered evidence showing that before making the investment he sought the advice and approval of the Union Indemnity Company, the surety on his guardian's bond, who has a·"joint control agreement" with the guardian as to the management of the estate of the ward, and was advised through its local agent that "The investment in first mortgage bonds, if guaranteed by a reputable surety company and approved by the Veterans' Bureau, will likewise be acceptable to us. We would bring to your attention, however, that when these securities are purchased that they should be held under your joint control just as effectively as the cash in bank was handled."

He also offered evidence showing that he sought and received the advice of different financial institutions and agencies as to the advisability of such investment, and that same met their approval; that he also invested some of his individual money in bonds of said Continental Mortgage Company.

The evidence shows that the Central Bank & Trust Company of Asheville, N. C., was named as trustee, and, under the trust agreement, "the Board of Directors of the Continental Mortgage Company could designate to be pledged with the Trustee as security for each issue of bonds * * * (a) cash; (b) and/or United States Bonds; (c) and/or First Mortgages and/or instruments of like legal effect, and/or (d) obligations of similar mortgage companies."

The trust indenture also provides: "That the Board of Directors at the time of authorizing each series of bonds may restrict the security to that described in either of the preceding forms, clauses or in any two or three of them, 'and the security designated by said Board of Directors for each series of bonds shall be described by appropriate language in all of the bonds of such series issued hereunder and none other than that so designated by the said Board of Directors at the time of authorizing the issue of each series of bonds shall be deposited and pledged by the Company with the Trustee or accepted by the Trustee as security for any such bond of such series.' Reference to a description of the bonds of the series purchased by the appellee, shows that the security pledged for payment of his bonds was *restricted to cash, United States bonds and first mortgages on real estate and/or instruments of like legal effect.*" (Italics supplied.)

The trustee allowed cash upward of $200,000 to accumulate in its hands, affecting the issue of the series of $1,000,000 of bonds, to which the bonds purchased by appellee belonged, and with this money on deposit closed its doors, forcing the Continental Mortgage Company into liquidation, entailing a loss to the bondholders of upward of 60 per cent. of their investments.

It is conceded that the expenditures here involved were made in the utmost of good faith, and appellee's major contention is that the United States has retained supervision and control over the investment of funds paid to guardians under the War Risk Insurance Act of Congress, through the Veterans' Bureau, as a government agency, and inasmuch as the purchase of the bonds was approved by the Regional Attorney of the Veterans' Bureau, he is not chargeable with the loss.

In support of this contention, section 450, USCA, title 38, pages 215, 216, is cited. That section provides: "Where any payment under this chapter is to be made to a minor, other than a person in the military or naval forces of the United States, or to a person mentally incompetent, or under other legal disability adjudged by a court of competent jurisdiction, such payment may be made to the person who is constituted guardian, curator, or conservator by the laws of the State or residence of claimant, or is otherwise legally vested with responsibility or care of the claimant or his estate: *Provided,* That prior to receipt of notice by the bureau that any such person is under such other legal disability adjudged by some court of competent jurisdiction, payment may be made to such person direct: *Provided further,* That for the purpose of payments of benefits under Part II of this chapter, where no guardian, curator, or conservator of the person under a legal disability has been appointed under the laws of the State or residence of the claimant, the director shall determine the person who is otherwise legally vested with responsibility or care of the claimant or his estate: *And provided further,* That the director, in his discretion, may suspend such payments to any such guardian, curator, conservator, or other person who shall neglect or refuse, after reasonable notice, to render an account to the director from time to time showing the application of such payments for the benefit of such minor or incompetent beneficiary. (June 7, 1924, c. 320, § 21, 43 Stat. 613.)"

There is nothing in the provisions of this section to indicate that it was the intent of the Congress to confer on the Veterans' Bureau any control or authority over such funds after they have come into the custody, possession, and control of a guardian, curator, or conservator, or to relieve, in any respect, the guardian, curator, or conservator of the responsibility imposed on such statutory trustees by the laws of the state under which they are appointed. The right of the director, "in his discretion," to suspend payment to any such "guardian, curator or conservator," does not connote an intent that supervision shall be retained after the money comes into the possession of such guardian, curator, or conservator.

The acts of Congress in respect to trust funds and trust estates, resulting from the payment of money by the government under the War Risk Insurance Act, clearly evince the policy that such trust shall be administered and distributed under and in accordance with the laws of the state in which the beneficiary or cestui que trust has his residence, with the single exception that in case of the death of a beneficiary there remains unpaid installments, and he leaves no heirs or distributees entitled to take, such unpaid installments escheat to the United States instead of the State. USCA, title 38, § 451, page 216; First Nat. Bank of Chattanooga, Tenn., et al. v. Forester, 223 Ala. 218, 135 So. 167; McGilvary et al. v. Reynolds et al., 224 Ala. 435, 140 So. 417.

The next contention of appellee is, that at the time he invested his ward's money in said bonds of the Continental Mortgage Company, he was a special guardian under the provisions of sections 8120–8134 of the Code 1923.

If appellee was such special guardian, he clearly exceeded his statutory power. He was without authority to invest the funds of the ward in any sort of property. The statute provides, that: "The sole power of the guardian so appointed * * * shall be to receive any money or moneys due the beneficiary under the said act of congress, and to distribute same for the benefit of the said beneficiary * * * to receive for the account of the said beneficiary any money or moneys due from the United States government in the way of arrears of pay, bonus, or other sums due by reason of his or her service (or the service of the person through whom the beneficiary claims)." Code 1923, § 8125; Gerald and wife v. Bunkley, 17 Ala. 170.

The record shows that appellee was appointed as guardian of the person and estate of said Vernon A. White after said Vernon A. White had, on an inquisition of lunacy, been adjudged insane, and after the estate of said ward had been in process of administration by a former guardi-

an, who had died, and final settlement made by the deceased guardian's personal representative.

In these circumstances, said section 8120 et seq. are without application, and the appellee's liability is governed by the law applicable, generally, to guardianships.

Where the character of investment or loan which a guardian may make is prescribed by statute, the guardian may lawfully invest only in such security as is prescribed, and if he receives, as guardian, securities of other kinds, he does so at his peril. 28 C. J. 1141, § 236; Thompson v. Thompson, 92 Ala. 545, 9 So. 465; Meyers et al. v. Martinez et al., 172 Ala. 641, 55 So. 498.

The Constitution of 1875, article 4, § 35 (vol. 1, Code 1923, p. 290), declared that: "No act of the General Assembly shall authorize the investment of any trust-funds by executors, administrators, guardians, and other trustees, in the bonds or stock of any private corporation; and any such acts now existing are avoided, saving investments heretofore made." These provisions were carried into the present Constitution, 1901, as § 74, declaring: "No act of the Legislature shall authorize the investment of any trust funds by executors, administrators, guardians or other trustees in the bonds or stocks of any private corporation; and any such acts now existing are avoided, saving investments heretofore made."

This section of the Constitution is not only a limitation on the power of the Legislature, but its provisions declare and establish the public policy of the state in respect to the investment of trust funds in stocks and bonds of private corporations, and such investment is unauthorized, certainly in the absence of express authority conferred by the instrument creating the trust. Randolph v. East Birmingham Land Co. et al., 104 Ala. 355, 16 So. 126, 53 Am. St. Rep. 64; Davis v. State, 68 Ala. 58, 62, 44 Am. Rep. 128; License Tax Cases (United States v. Vassar), 5 Wall. 462, 18 L. Ed. 497; 4 Mayfield's Dig. 597, § 1; 28 C. J. 1141, § 236.

This section of the Constitution leaves no room for appellee's further contention that bonds of a private corporation are within the influence of section 8149 of the Code, which provides that: "It is the duty of the guardian to manage the estate of his ward frugally, and to improve it to the best of his skill and ability. He must, if practicable, lend out all surplus money of the ward on bond and mortgage, or on good personal security, and, if the bond is not renewed annually, require the interest to be paid at the end of each year." (Italics supplied.)

It is well settled that the ward, who has become sui juris, may, on final settlement of the guardianship, ratify an unauthorized investment by the guardian and claim the benefits thereof, or may repudiate such investment and charge the guardian with the money invested, with interest, with the result that the property so acquired is the property of the guardian. Meyers et al. v. Martinez et al., 172 Ala. 641, 55 So. 498; Martinez v. Meyers (fourth appeal), 181 Ala. 293, 61 So. 810; Waring v. Lewis et al., 53 Ala. 615, 633.

The appellant in this case, however, was not competent (being non compos mentis) to make such election, and the guardian ad litem was without authority to so elect.

Our judgment, therefore, is that the probate court erred in allowing the appellee credit for the money of the ward invested by him in said bonds, and not charging him therefor with interest.

The decree of the probate court is reversed, and the cause remanded.

Reversed and remanded.

GARDNER, THOMAS, and KNIGHT, JJ., concur.

## On Rehearing.

BROWN, Justice.

In support of the application for rehearing it is asserted that section 35 of article 4 of the Constitution of 1875 "was evidently borrowed from the Constitution of the State of Pennsylvania," adopted in Philadelphia on November 3, 1873. This conclusion seems to be drawn from the fact that section 22 of article 3 of the Pennsylvania Constitution of 1874, adopted as above stated, is in the identical language of section 35 of article 4 of the Constitution of 1875, this state.

It appears from the Journals of the Constitution of 1875, that the Constitutional Convention that drafted and adopted the Constitution of 1875, assembled on the 6th day of September 1875, concluded its work and adjourned on the 4th of October, 1875,

and the Constitution adopted by that Convention became effective December 6, 1875.

Assuming that the conclusion that the provisions of section 35, article 4, were borrowed from the Pennsylvania Constitution of 1874, is well grounded, it does not appear that the Pennsylvania court of last resort had construed and applied the provisions of section 22 of article 3 prior to the adoption of the Alabama Constitution of 1875; but it does appear that the law of said state was then settled, by an opinion of its Supreme Court, speaking through Black, C. J., filed May 17, 1852, in which it was said:

"In England it has been held for more than a century past to be settled law, that a trustee can only protect himself from risk, when he invests the trust fund in real or government securities, or makes the investment in pursuance of an order by the court: 3 Atkyns 444; 5 Ves. 838; 7 Ves. 150; 1 Madd. 290. The same rule has been adopted in its whole length and breadth by the Courts of New York and New Jersey: [Smith v. Smith] 4 Johns. Ch. [N. Y.] 281; [Ackerman v. Emott] 4 Barb. [N. Y.] [626]; 2 Story's Eq. 638. In Pennsylvania this doctrine does not appear ever to have been either affirmed or denied. * * * So far therefore as our own authorities go, the question is an open one. But the time has come when the interests and rights of trustees, as well as orphans, married women, and insane persons, demand the settling of it, and we think the rule here ought to be as it is elsewhere, not because we feel bound by the precedents of a foreign state, but because we cannot resist the considerations of justice and policy by which they are supported.

"It has never been doubted anywhere, that a loss which accrues of a trust fund, invested on personal security, must be borne by the trustee. Is the stock of a banking, manufacturing, and trading corporation any better? Certainly not, if it be true (and who will deny it?) that men associated together are subject to the same accidents, and exposed to the same temptations that individuals are. Chief Justice Gibson, in Twaddell's Appeal [5 Barr (5 Pa.) 15], said that banking was essentially hazardous; from which I infer, that he thought bank stock even more doubtful than personal security.

"If a trustee may throw off his responsibility by investing the trust fund in the stock of a corporation, what security is left for the cestui que trust? Not even the personal responsibility of the corporators. On the contrary, the cestui que trust becomes, to the extent of the fund, liable for their misconduct, as well as for all the casualties of commerce, to which their business is exposed. There is no reason why the trustee should not make the investment in some security which cannot fail. It is just as convenient. In the country real security can always be had; and in the cities and large towns, there is no trouble about getting government stocks. It is better for trustees that the rule of their conduct should be clearly defined and well understood. A plain path, though it may be a narrow one, is safer to walk in than a trackless waste, where no man can be sure that he is on the right course. If the occasion had arisen twenty years ago for laying down the true rule, the present loss would not have occurred. Then the trustees would certainly not have stood by and seen the stock going down gradually, from $122 a share to nothing, without making an effort to save at least a part of it. But, unfortunately, they believed they had done their whole duty in the purchase of the stock, and were by that act absolved from all further obligations to see to the interests which had been committed to them. It may be severe to correct, in this way, an error as honest as theirs was; but we cannot help it. Durum est valde durum; sed ita lex scripta est." Hemphill's Appeal (Bacon's Appeal), 18 Pa. 303, pages 305, 306.

This doctrine was reaffirmed in Worrell's Appeal, 23 Pa. 44, 48, 49, in March, 1854, by the court, speaking through Knox, J.:

"In Worrell's Appeal, 9 Barr [9 Pa.] 508, it was held that this appellant was liable for an investment in the stock of the Schuylkill Navigation Company of moneys received by him for his ward. The decision was in accordance with former adjudicated cases, and has been followed by others of like import. It may now be considered as settled law, that in Pennsylvania an investment by a guardian or other trustee, unless authorized by the deed of trust, in the stock of an incorporated company, whether a bank, railroad, canal, manufacturing, or mining corporation, cannot be made at the risk of a ward or other cestui que trust. It is unnecessary to repeat the reasons which are the foundation of this rule. In England and in this country the

adoption of the rule has been found essentially necessary for the protection of those who could not protect themselves. It will not do to say that because prudent men sometimes invest their own money in such stocks, guardians may legally invest the estate of their wards in like manner.

"One who is entitled to the appellation of a prudent man, incited by the hope of a large return, may make an investment understood to be of a speculative or experimental character. He calculates the chances and takes the risk. If fortunate he pockets the profits; if not he must stand the loss. But with trust funds no such hazard can be permitted."

And in Commonwealth ex rel. v. McConnell, 226 Pa. St. Rep. 244, 247, 75 A. 367, 44 L. R. A. (N. S.) 889, decided in 1910, the Pennsylvania Court observed: "The doctrine thus firmly established in this state prohibits a trustee from investing the estate of his cestui que trust in the bonds or stocks of a private corporation. The people of the commonwealth have attempted to enforce the rule by article 3, § 22, of the present Constitution, which prohibits the General Assembly from authorizing the investment of trust funds by a trustee in the bonds or stocks of any private corporation. Time has tested the wisdom of the rule, and, as our cases declare, it is firmly established in this commonwealth."

Here we have the history of the doctrine, the reasons underlying it, and the purpose and intent of the constitutional provisions reaffirming it.

In Re Maroney's Estate, 311 Pa. 336, 338, 340, 341, 166 A. 914, decided in 1933, the questions presented were whether or not, "under section 41 of the Fiduciaries Act of June 7, 1917, P. L. 447, amended April 26, 1929, P L. 817, a trustee may invest in a first mortgage, secured upon real estate of a Pennsylvania corporation, accompanied by the single bond of the corporation to the trustee as sole obligee," and whether or not the statute, if construed to so authorize, contravened the provisions of section 22 of article 3 of the Constitution of said state?

In the opinion of the court it is stated that:

"Section 41 of the Fiduciaries Act as amended in 1929 [20 PS § 801], authorizes investment, inter alia, in 'first mortgages on real estate in this Commonwealth, securing bonds or other obligations not exceeding in amount two-thirds of the fair value of such real estate. * * *' The challenged investment (a) is a first mortgage, (b) on real estate in the commonwealth, (c) in amount less than two-thirds of the fair value of the land. The Farmers' Investment Company is mortgagor, *and the accountant mortgagee.* If made by an individual, its legality could not be questioned on the ground taken by expectant. [Italics supplied.] * * *

"The purpose, as well as the popular understanding of article 3, § 22, undoubtedly was that investment in personal securities of private corporations should not be authorized by legislation. By section 14 of the Act of March 29, 1832, P. L. 190, 193, fiduciaries were authorized, with the approval of the orphans' court, to invest in specified public obligations, 'or on real securities'; by section 2 of the Act of April 13, 1854, P. L. 368, 369 (20 PS § 3172), they were authorized 'to invest trust moneys in ground rents or other real estate by leave of the proper court.' It appears not to have been until 1870, that the field of investment was enlarged to include personal securities of corporations. For then, by Act of April 1, 1870, P. L. 45, the provisions of section 14 of the act of 1832, supra, were extended to include bonds of the Pennsylvania Railroad Company secured by its general mortgage of July 1, 1867; by an Act of March 29, 1872, P. L. 31, to the general mortgage bonds of the Philadelphia & Reading Railroad Company; by an Act of April 3, 1872, P. L. 833, to the general mortgage bonds of the Lehigh Coal & Navigation Company; and by the Act of April 4, 1873, P. L. 59, to bonds issued by the Pennsylvania Railroad Company under an Act of February 18, 1873 (P. L. 129). The necessity for this enlargement is legislative recognition that bonds of the kind specified in these statutes were not real securities as defined for purposes of the classification referred to, for if they had been, the legislation would have been unnecessary. The effect of this radical change in economic policy became the subject of serious discussion in the constitutional convention of 1873 (Debates: vol. 2, p. 744 et seq., vol. 5, p. 293 et seq.) and was ultimately reflected in the prohibition on future legislation contained in article 3, § 22. It is to be noted that by the acts of 1832 and 1854, supra, the right to invest in real securities was general, and not limited to mortgages by

individuals. The corporate mortgage, made as in this case, is as completely a real security as the mortgage of an individual. Section 22 does not in terms deny power to authorize investment in real securities given by corporations, and there is nothing to indicate intention to change the policy of the law theretofore existing as respects trust investment in real securities, nothing to show that it was intended to operate differently on the mortgage of a given tract of land if given by a corporate owner of the tract direct to the mortgagee than if the same mortgage were made by an individual owner. On the contrary, the bonds and stock that are condemned as trust investments are of the class designated as personal securities, of which those mentioned were well known examples."

The clear effect of that opinion is that a mortgage on real estate, securing a loan or investment, executed direct to the trustee is a "real security" not within the influence of article 3, § 22, of the Pennsylvania Constitution; that such bonds as the "bonds of the Pennsylvania Railroad Company secured by its general mortgage," and other named corporations, were of the class of securities "condemned as trust investments."

On the appeal in Re Curran's Estate, 312 Pa. 416, 420, 167 A. 597, 599, the construction of the act of 1923 was the only question involved, as stated by the court, " 'the constitutionality of the Act of 1923' is not 'involved.' " The act (Act Pa. June 29, 1923, P. L. 955) authorized investments by trustees "in bonds of one or more individuals secured by mortgage on real estate in this [that] Commonwealth, which may be either a single bond secured by a mortgage or one or more bonds of an issue of bonds secured by mortgage or deed of trust to a trustee for the benefit of all bondholders." The decision in that case is not, therefore, here pertinent.

The provisions of our statute (Code 1923, § 8149) are more restrictive. They provide that the guardian "must, if practicable, *lend out* all surplus money of the ward on *bond and mortgage,* or on good personal security, and, *if the bond is not renewed* annually, require the interest to be paid at the end of each year." (Italics supplied.) Thompson v. Thompson, 92 Ala. 545, 547, 548, 9 So. 465; Cunningham v. Cunningham, 215 Ala. 484, 111 So. 208. The statute clearly contemplates *bond and mortgage* direct to the guardian as payee

and mortgagee; a bond which may be renewed annually. It clearly does not contemplate bonds of private corporations secured by trust agreements under which collateral may consist of either money, government bonds, or mortgages on real estate, or instruments of like legal effect, wherein "the company (obligor on the bond) reserves the right to withdraw any of the first mortgages and/or instruments of like legal effect, and/or the bonds of the United States of America, so deposited and pledged with the trustee as security for the bonds issued under and secured by said indenture (trust agreement), upon paying to the trustee the principal amount of the first mortgages, and/or instruments of like effect and/or bonds of the United States of America so withdrawn, and/or substituting therefor other first mortgages, and/or instruments of like legal effect, secured and guaranteed as herein and in said indenture provided, and/or other bonds of the United States of America, of any issue, equal in principal amount to the principal of the security so withdrawn."

The only alternative left to the holder of such bond to realize thereon is to sell the bond, and its marketability is wholly dependent upon the reputation of the obligor and the status of its business at the time. He has no voice in the enforcement of the obligations held as collateral under the trust agreement, except as a common creditor, and his relation to the situation is very much the same as a minority stockholder in a private corporation. This character of security is clearly within the class condemned as unfit for trust investments by the provisions of the Constitution. Randolph v. East Birmingham Land Co. et al., 104 Ala. 355, 16 So. 126, 53 Am. St. Rep. 64.

This conclusion is re-enforced by the provisions of section 10413 of the Code 1923, that: "A trustee, having moneys to invest or lend, may invest them in the purchase of the interest-bearing securities of the state, or of the United States; but for such investment his liability is governed by the general rules of law."

And if such investment is to be made without this state, such investment cannot be made without the authority of a decree of the circuit court. Code 1923, §§ 10414–10417.

Randolph v. East Birmingham Land Co. et al., supra, was decided in 1894, and thereafter the representatives of the peo-

ple, in convention assembled, brought forward the provisions of section 35 of article 4 of the Constitution of 1875 into the Constitution of 1901 as section 74, without change. In that decision it was declared: "The policy of the law of this state forbids such investments, for it is provided in the constitution itself, that 'No act of the general assembly shall authorize the investment of any trust fund by executors, administrators, guardians and other trustees in the bonds or stock of any private corporation.' Article 4, § 35." 104 Ala. 355, 366, 16 So. 126, 129, 53 Am. St. Rep. 64.

By such readoption the interpretation was made a part thereof, and that section became self-executing, in so far as it condemns such investments.

The application for rehearing is overruled.

ANDERSON, C. J., and GARDNER and THOMAS, JJ., concur.