191 So. 363

# TITLE GUARANTEE LOAN & TRUST CO.
## v. WOODWARD et al.

### 6 Div. 498.

Supreme Court of Alabama.

Oct. 5, 1939.

Ormond Somerville, of Birmingham, for appellee Joseph W. Simpson.

Smyer, Smyer & Bainbridge, of Birmingham, for appellant.

306

Wm. M. Spencer, Jr., Wm. B. White, and Bradley, Baldwin, All & White, all of Birmingham, for appellees life beneficiaries.

GARDNER, Justice.

In December 1917, J. H. Woodward died. leaving a last will and testament, with codicil thereto. The will and codicil were duly admitted to probate shortly after his death; and in the codicil appellant, Title Guarantee Loan and Trust Company, was appointed trustee, and will hereinafter be so designated.

The said Woodward left surviving him his widow, Martha Woodward, and three children, A. H. Woodward, Bertha W. Underwood and Margaret W. Hopkins, and no descendants of a deceased child.

The daughter Margaret W. Hopkins died in 1930, and left surviving her only one child, Margaret Evins Spencer, and a grandchild, Joseph W. Simpson, the son of her deceased daughter, Josephine E. Simpson. Defendant Bertha W. Underwood is now living and has no children or lineal descendants. A. H. Woodward, the son, is now living and has five children, all made parties defendant to this bill, to-wit: Joseph H. Woodward, A. H. Woodward, Jr., Anne Woodward Burt, Eugenia Jemison Woodward, and Martha Woodward Webb. Marion Wallace, named in item 7(c) of said codicil, still survives.

The trust here in question was created by item 7 of the codicil of said will, the pertinent provisions of which are as follows:

"Item 7: All the rest and residue of the property, both real, personal and mixed property of every kind and character of which I die seized and possessed, and wheresoever situated, I give, devise and bequeath to the Title Guarantee Loan and Trust Company, a body corporate under the laws of Alabama, with its principal place of business in Birmingham, Alabama, (and hereinafter called trustee) in trust

with the powers and for the uses and purposes hereinafter set forth, to-wit:

"(a) My executors are to turn over, as soon as practicable, the trust property to the trustee, and the trustee shall preserve, manage, look after and control said trust property, collecting the rents, income and profits therefrom, with power in the trustee necessary or deemed necessary for these purposes and for the protection of said trust property, or any part thereof. The trustee shall have the authority and power to sell and convey, at private sale, and without order of court, any of the trust property coming into its custody at any time and reinvest the proceeds of any sale or sales or any money coming into its custody as trustee from time to time as it deems best, provided, however, that the trustee shall have no authority or power to sell any property belonging to the trust estate without the written approval of my son, Alan H. Woodward, and Reginald H. Banister, or one of them, so long as they or either of them may live, and are competent to act and are personally present in the United States, and provided further that said trustee shall have no authority or power to make a reinvestment of the trust funds at any one time amounting to a sum exceeding Ten Thousand ($10,000.00) Dollars, without the written approval of my son, Alan H. Woodward and Reginald H. Banister, or one of them, so long as they, or either of them may live, and are competent to act and are personally present in the United States.

"(b) The trustee is authorized and directed to pay from income all cost and expense incident to the protection and preservation of the trust estate, including taxes and insurance on the trust property, and including taxes, insurance and repairs of the property devised to my wife for life, and compensation to the trustee.

"(c) I direct the trustee to pay over from the net income from the trust estate the sum of Twenty-five ($25.00) dollars per month to Marion Wallace during the life of Marion Wallace.

"All the rest and residue of the net income from the trust estate I direct the trustee to pay over as and when received, share and share alike, to my wife, Martha Woodward, my son, Alan H. Woodward, my daughter, Bertha W. Underwood, and my daughter, Margaret W. Hopkins, or the survivors of them (except the share of my daughter, Margaret W. Hopkins, is to be subdivided as hereinafter set forth).

"The share of the net income set aside for my daughter, Margaret W. Hopkins, I direct to be subdivided, and one-third of same is to be paid over to Margaret Evins Spencer (if she be living), and one-third is to be paid over to Josephine W. Evins after said Josephine W. Evins arrives at the age of twenty-one years, two-thirds to be paid over to my said daughter, Margaret W. Hopkins, until Josephine W. Evins arrives at the age of twenty-one years, but with the expectation that my daughter, Margaret W. Hopkins, will provide for the support, maintenance and education of said Josephine W. Evins until she arrives at the age of twenty-one years, one-third to be paid over to my daughter, Margaret W. Hopkins after Josephine W. Evins arrives at the age of twenty-one years. In the event either Margaret W. Spencer or Josephine W. Evins should die, if Margaret W. Hopkins be living, she is to take the share of the income which the deceased would have taken if living. Upon the death of either of my children, the said child or children of my deceased child shall take the share of the income. which the parent would have taken if living.

"(d) This trust is to continue during the life of the survivor of my three children, Alan H. Woodward, Bertha W. Underwood and Margaret W. Hopkins, and the trust is to terminate at the time of the death of the survivor of my three children.

\* \* \*

"(f) It is my will and I direct the trustee on the termination of, this trust under the provisions hereof, to divide the trust property, share and share alike between my grandchildren then living, the child or children or descendant of any deceased grand-child taking the share which the parent would have taken if living, provided however, that in the event my wife, Martha Woodward should be living when the trust terminates under the provisions hereof, the trustee is to set aside from the trust property in its custody the sum of One Hundred Thousand ($100,000.00) Dollars to be held and used by the trustee to the extent necessary for the comfortable support, and maintenance of my wife during her life, and after her death, the balance of said trust fund of One Hundred Thousand ($100,000.00) Dollars, if any, shall be divided between my grand-children on the same basis as set forth in this paragraph.

"(g) The trustee, if required, shall give bond with surety company as security to guarantee faithful performance of its duties in such amount and at such time or times as may be in writing required by my wife and children or a majority of them or by the survivors or survivor of them, but at the cost and expense of the trust estate. I direct that the trustee shall rent and keep a safety deposit box and keep all securities, such as principal notes, stocks and bonds in such safety box, and that it must take at least three keys to open said box, and that one of said keys shall be turned over to my wife, Martha Woodward, and retained by my wife, Martha Woodward, or my son, Alan H. Woodward, or Reginald H. Banister (as they may from time to time agree among themselves) and the trustee shall not enter said box without the presence of either my wife, or my son, or Reginald H. Banister, or some one designated in writing by them, or by the custodian of the key, so long as they, or either of them be living and competent to act. In the event my said wife and son and Reginald H. Banister should all die or become incompetent to act before the termination of this trust, then my daughters or one of them, if they be living and competent to act shall be the custodian of the key to the box, and be present in person or by agent designated in writing at the opening of the box, or in the event both of my daughters should be dead or incompetent to act, my adult grandchildren living shall in writing to the trustee, designate a custodian of the key, who is to be present in person or by duly designated agent at the opening of the box.

"In making division of the trust property on the termination of this trust, under the provisions hereof, the trustee shall have the authority and power to divide the trust property in kind or partly in kind, or may sell and convey at private sale and without order of court, such of the trust property and security as it may deem necessary, and divide the proceeds or equalize the division with the proceeds.

"(h) It is my will, and I direct that all stock (in corporations) belonging to the trust estate shall be represented and voted at all meetings of stockholders by or under the direction of my son, Alan H. Woodward, so long as he may live, and be competent to act, or by Reginald H. Banister, so long as he may live and be competent to act, and to this end, the trustee is directed to execute to my son, or to whomsoever he may in writing designate, a proxy or power of attorney authorizing the voting of stock from time to time, or if my son should fail or decline to request a proxy or power of attorney, a proxy or power of attorney shall be executed by the trustee to Reginald H. Banister, or to whomsoever he may in writing designate, authorizing the voting of the stock.

"The trustee shall not be required to file an inventory of the trust property, in its custody, in any court, but the trustee shall, at all times have and keep an inventory of the trust property on hand, and shall exhibit such inventory at all reasonable times to any person beneficially interested who desires to see the same."

Pursuant to the terms of this codicil, the appellant, in its capacity as trustee, received from the executors of the estate a number of bonds issued by the Woodward Iron Company, with maturity date January 1, 1952, each in the denomination of $1,000, and bearing interest at the rate of five per cent per annum, evidenced by attached coupons.

On January 1, 1933, the said Woodward Iron Company defaulted in the payment of semi-annual interest then due on said bonds and continued to make default in the payment of interest, and allowed the same to accumulate, including the interest due January 1, 1937; the accumulation of unpaid interest on each of said bonds up to and including the interest due on January 1, 1937, being $225.

In October, 1936, the Woodward Iron Company filed a petition in the United States District Court for the Northern District of Alabama for the purpose of procuring a reorganization of said company under what is commonly referred to as section 77B of the Federal Bankruptcy Act, as amended, 11 U.S.C.A. § 207, and pursuant thereto the said company was reorganized in accordance with a plan, the details of which are unnecessary to relate.

In accordance with this plan, appellant exchanged the old bonds of the Woodward Iron Company held by it as trustee, and received in lieu of each $1,000 bond with interest coupon attached, $500 principal amount of first mortgage (new fixed interest) bonds, $600 principal amount of second mortgage (new income) bonds, and $125 in cash. In the plan of reorganization it was provided that such exchange was in satisfaction of the principal and interest on the old bonds.

Appellant as trustee was also on and prior to January 1, 1937, the holder of a number of shares of six per cent preferred stock issued by said Woodward Iron Company, which stock was entitled to receive cumulative dividends at the rate of six per cent per annum upon the par value of $100 per share; and at the date of reorganization the accrued and unpaid dividends upon said preferred stock amounted to $36 per share.

In the plan of reorganization it was provided that the holders of the old six per cent preferred stock were to receive, for each share thereof, three and one-half shares of new common stock, and the exchange was made by appellant as trustee in accordance with this plan. The exchange was made April 1, 1937, and on said date such sales of the new securities of the Woodward Iron Company as took place showed a mean between the bid and asked price for the new fixed interest bonds of 102¼, for the new income bonds of 155— per $100 of par value, and the new common stock of said company at $38 per share, all of the shares of common stock having a par value of $10 per share.

Upon completion of the reorganization and exchange of securities, the trustee regarded the $125 received in cash upon the exchange of the old bonds as a receipt of interest, and distributed the same as income to the life beneficiaries entitled to the net income from said trust.

The new income bonds received by the appellant trustee on account of the old bonds contained an option on the part of the holder to convert them into common stock for each $1,000 principal amount of new income bonds converted, which option, in the event of a call for redemption of said new income bonds, was required to be exercised within ninety days of the date of such call. Certain of the new income bonds were called by the company for redemption during 1937, and appellant exercised the privilege of converting the same into common stock. This exchange was made with the written consent and approval of A. H. Woodward, but without prejudice to the rights of any of the beneficiaries of the trust.

Following the reorganization of the company and the exchange of securities, as stated, there arose conflicting views between the life beneficiaries, those entitled during their lives to the net income of the trust, and the remaindermen, as provided in the will and codicil thereto, as to what in fact constituted net income distributable to the life beneficiaries.

As to the exchange of the bonds of the company, the life beneficiaries contended they were entitled to either (a) the $125 cash and $100 principal amount of each $600 principal amount of the new income bonds received by the trustee; or (b) said $125 cash and 1/11 of the new fixed interest bonds and 1/11 of the new income bonds so received; or (c) 225/1225 of the cash, 225/1225 of the new fixed interest bonds and 225/1225 of the new income bonds received by the trustee. And as to the old preferred stock, these life beneficiaries insisted that a portion of the shares of the common stock received in exchange for the preferred, was received in lieu of accrued and unpaid dividends upon said preferred stock, and that based upon the market value of the common stock received as of April 1, 1937, at least $33 per share of said six per cent preferred stock was received by the trustee in discharge of said accrued and unpaid dividends, and was distributable to the life beneficiaries as net income.

The remainder beneficiaries, on the other hand, insist that all the new bonds and stock received by the trustee upon said reorganization constituted corpus of said trust estate.

The trustee was of the opinion it was fully authorized to convert new income bonds, which had been called for redemption, into common stock of the company upon and with the written approval of A. H. Woodward at any time any of said bonds might be called for redemption in lieu of accepting cash to the extent of the principal thereof plus cash to the extent of accrued interest thereon to the date of redemption.

But this authority appears likewise to have become a matter of dispute. And in view of these various contentions, the trustee filed this bill for instructions as to the proper performance of its duties as trustee under the codicil to the will of said J. H. Woodward, deceased.

There were no disputed facts, and the cause was submitted upon bill, answer and agreed stipulation of facts by counsel. On April 1, 1937, the date of exchange of securities, the fair market value of the new fixed interest bonds per $100 face amount thereof was 102¼, the new income bonds per $100 face amount was 155, and the new common stock per share $38. This

common stock was of par value $10 per share, but its book value was in excess of $40 per share.

Testator, J. H. Woodward, had organized, promoted and controlled, with his associates, the Woodward Iron Company, and had on one or more occasions refused a sale of his holdings, though offered a very substantial sum therefor.

Under the reorganization plan no dividends were payable upon its new common stock until retirement of an amount in excess of $7,000,000 of the new income bonds and new fixed interest bonds. It further appears that the aggregate value of the property and assets of the company on April 1, 1937, was substantially in excess of amounts payable to all preferred stockholders had the company been dissolved and its assets then been distributed to its stockholders.

There was in addition to the six per cent preferred stock a seven per cent preferred issue, and of course the accumulated unpaid dividends exceeded the accumulation on the six per cent preferred. In the reorganization plan this excess of accumulation was taken care of by a payment to the seven per cent preferred of $2.81 per share cash in addition to the issuance of three and one-half shares of new common stock against each share of old seven per cent preferred. But further details may well be omitted, as the facts stated in a very general way should suffice for the purposes of this appeal.

The chancellor decreed that $^{1000}/_{1225}$ of all cash and bonds received by the trustee upon reorganization of the Woodward Iron Company in exchange for old bonds and accrued interest constituted corpus of said trust estate, and that $^{225}/_{1225}$ thereof represented income. And as to the exchange of preferred stock for the new common stock received by said reorganization, the holding was that $^{100}/_{136}$ thereof constituted corpus of the trust estate, and that $^{36}/_{136}$ constituted income. The chancellor disapproved the contention that the net income distributable to the life beneficiaries must necessarily be paid in cash and nothing more.

■ After all, it is a question of the testator's intention. It is the generally recognized rule that net income may be realized by a trustee and be distributed to life beneficiaries in the form of property as well as in the form of cash. Restatement of the Law of Trusts (American Law Institute) section 233, sub. (a). The following

authorities likewise sustain this view: Hazzard v. Philips, 173 App.Div. 425, 159 N.Y.S. 264; Union & New Haven Trust Co. v. Taintor, 85 Conn. 452, 83 A. 697; Thompson's Appeal, 100 Pa. 478; Millen v. Guerrard, Trustee, 67 Ga. 284, 44 Am.Rep. 720, and it is well supported by sound reasoning as well.

■ The life beneficiaries were children of the testator, and the trust was to be a long continuing one. Under these circumstances, as held by the Pennsylvania court in Re Nirdlinger's Estate, 327 Pa. 171, 193 A. 30, these life tenants are to be considered as the primary objects of the testator's bounty, and incomes should be preserved to them, as far as possible to do so, even though it may result in ultimate diminishment of principal to be paid the remaindermen at some uncertain future date. It is, we think, clear enough the testator intended for these life beneficiaries to receive the interest on these bonds when and in whatever form collected.

■ The new bonds taken in exchange by the trustee for the old included past due and unpaid interest. These interest coupons, unnegotiated or unused serve no independent purpose, and while in the hands of the holder remain mere incidents of the bonds and have no greater or other force or effect than the stipulation for the payment of interest in the bonds. 3 R.C.L. p. 846; 7 Corpus Juris 50; Bailey v. Buchanan County, 115 N.Y. 297, 22 N.E. 155, 6 L.R.A. 562; Mississippi Power & Light Co. v. Kusterer & Co., 156 Miss. 22, 125 So. 429. The new bonds included the past due interest on the old. This interest the testator intended for the benefit of the life beneficiaries, and the mere fact it appears in the body of the new bond and as a part thereof, rather than in interest coupons, is not a matter of material importance. The important fact is that this interest has been taken care of in the reorganization plan, and forms a part of the new bond.

■ The new bonds and the interest thereon being a single obligation, the proceeds should therefore be distributed between the life beneficiaries and the remaindermen in the proportion that the interest and principal, respectively, bear to the entire obligation, applied to each item of the proceeds.

■ This general principle is well recognized by the authorities: "Where not only principal, but also income, is represented in the investment or fund, an apportionment

should be had between the life tenant and remaindermen, and it has been held that profits on a sale of securities taken for a debt are to be apportioned between principal and income in the ratio which the principal sum involved bears to the interest due on it at the time of realizing on the securities." 65 Corpus Juris page 860. As having bearing by way of analogy, see, also, In re Chapal's Will, 269 N.Y. 464, 199 N.E. 762, 103 A.L.R. 1268; Hudson County National Bank v. Woodruff, 122 N.J.Eq. 444, 194 A. 266; In re Nirdlinger's Estate, 327 Pa. 171, 193 A. 30; Restatement of the Law of Trusts (American Law Institute) section 241.

In the decree rendered the court below applied this rule of apportionment, and we think correctly so. And in making the distribution accordingly, the trustee is of course to be credited with the $125 cash already received and distributed to the life beneficiaries.

■ For more than four years these life beneficiaries were without income, and we are of the opinion that when that long deferred income was received, whether in cash or some other form of property, they were entitled thereto, and this income being converted into bonds they were authorized to make their own decision as to when and at what price they would sell and obtain the proceeds.

■ It often happens that in a reorganization of a corporation under section 77B of the Bankruptcy Act a new corporation is formed, and entirely new securities issued, and the plan in the instant case first contemplated a new corporation. But this was found unnecessary, and the old corporation served the same purpose and the new securities were issued. The plan must be accepted by the necessary percentage of each class of creditors and stockholders, be fair and equitable, and work no unjust discrimination. In re Dutch Woodcraft Shops, D.C., 14 F.Supp. 467; In re National Food Products Corp., D.C., 23 F.Supp. 979.

For all practical purposes the reorganization of the company was equivalent in its result to its actual liquidation, and in effect the same as if it had been dissolved, a new company organized and securities of the new company received by the old and distributed in liquidation to its old security holders. The past due interest on the old bonds went forward and constituted a part of the new bonds. This interest was a part of income due these life beneficiaries, and the mere fact separate interest coupons were not issued therefor does not affect in any manner the rights of these life beneficiaries.

We think the chancellor has correctly apportioned these new securities as to income and corpus, and we see no reason why the interest represented in the new bonds should be allocated solely to the new income bonds rather than the new fixed interest bonds. The accepted plan of reorganization approved by the court calls for no such distinction.

■ Thus far we have been considering the matter of exchange of old bonds for the new. But the reasoning upon which our conclusion in that regard is reached is equally applicable to that feature of the plan calling for the conversion of preferred stock into common stock. It is clear enough that in this exchange the six per cent dividends in default were calculated and included in the plan of reorganization and in the issuance of the new common stock, and, indeed, an additional cash sum was paid to the seven per cent preferred stockholders to make good the difference between the two classes of preferred stock in the matter of default in the dividends.

It follows, therefore, as our conclusion that the chancellor likewise correctly decreed as to the apportionment as to this new stock between the corpus and the income, and we consider that further discussion as to this matter is unnecessary.

True, as is argued, ordinarily the stockholders have no legal right to share in the profits or assets of a corporation until a dividend has been declared, and such dividends are usually declared out of surplus profits. Mobile Towing & Wrecking Co. v. Hartwell, 208 Ala. 420, 95 So. 191. But we think this principle here inapplicable.

We are here concerned with the testator's intention as to the life beneficiaries, who were the prime objects of his bounty, and as to their rights in the distribution of assets of the corporation, which, as to all practical purposes, was dissolved, and new securities issued, which in fact embraced these deferred dividends. Certainly when these dividends were in fact realized, in whatever form and manner, the testator intended these life beneficiaries should get the benefit of their reception. This end

is accomplished by the decree rendered, which is here approved.

■ It appears that following the consummation of the plan of reorganization, and prior to December 31, 1937, $83,000 principal amount of the new income bonds which the trustee had received, were called for redemption by the company at a price of $100 per $100 principal amount thereof, plus interest thereon to the respective dates fixed by the respective calls thereof for redemption,—all in accordance with the provisions contained in these bonds. The bonds also contained a further provision giving to the holder the option of accepting cash or new common stock of the company on the basis of forty shares of said stock for each $1,000 principal amount of said new income bonds.

The trustee exercised its option and took in exchange the new common stock on the above noted basis, and received in cash the interest accrued on said bonds to their respective redemption dates and distributed the interest so collected to the life beneficiaries.

The chancellor concluded, and so decreed, that this exchange was equivalent to a purchase of the new common stock of the corporation, and as this stock was what may be termed a "non-legal" security, the exchange was unauthorized. The chancellor had reference of course to the provisions of our Constitution, section 74, and statute, section 10413, Code of 1923, and the cases of White v. White, 230 Ala. 641, 162 So. 368, and Randolph v. East Birmingham Land Co., 104 Ala. 355, 16 So. 126, 53 Am.St.Rep. 64. But these decisions, in harmony with the current of authority elsewhere (99 A.L.R. 912 et seq.; 26 R.C.L. page 1310; In re Detre's Estate, 273 Pa. 341, 117 A. 54) recognize the right of the creator of the trust to authorize investments in other than "legal" securities.

And the single question here for determination is whether or not the testator in the codicil to his will has granted so wide a discretion in the trustee as to justify an investment other than as sanctioned by the constitutional and statutory provisions above noted. We think that a brief consideration of the facts and surrounding circumstances, in connection with the language of the codicil clearly demonstrates the testator did not intend that the trustee be restricted in the matter of investment to what, for convenience, the authorities refer to as "legal" securities.

First, it is to be noted that more than one-sixth in value of the testator's personal estate was in common stock of the Woodward Iron Company, which he had founded and which had long been controlled by him and his associates, nearly one-sixth in value was in preferred stock of the company, and more than one-sixth in value in bonds of that company. All of which disclose that more than one-half in value of testator's personal estate was in securities of the company which he had founded, and during his lifetime he had refused to sell, though offered a substantial price for his holdings therein. Over one-fourth in value of his personal estate was in the preferred and common stocks of another iron company (an affiliate to the Woodward Iron Company), the La Belle Iron Works.

As to the language of the codicil we make reference to sections (a) and (h) in Item 7, which have been heretofore reproduced, and need not be repeated. It will apppear from a careful reading of these provisions that the testator invested the trustee with broad powers as to management, control, sales and investments, but with the limitation that no sale be made without the written consent and approval of A. H. Woodward and R. H. Banister, or one of them, and a further limitation that no investment of funds in excess of $10,000 should be made without a like approval.

A provision of this latter character was considered of controlling importance upon the matter of intent in the case of In re Channing's Estate, 129 Misc. 393, 222 N.Y. S. 351, and In re Leavitt's Will, 135 Misc. 387, 238 N.Y.S. 109.

It is hardly consonant with sound reasoning that the testator would have placed this limitation upon the trustee as to reinvestment had he intended that such investments be restricted to those controlled by the laws of the State of Alabama. In this codicil the testator made careful provision for the safe keeping of "principal notes, stocks and bonds," and specifically provided for voting of corporate stock held by the trustee by his son or R. H. Banister.

The question considered from all angles, we conclude the testator did not intend that the matter of reinvestment be limited to what is generally known as "legal" securities.

■ We have thus far treated the question in a broad sense, conceding, without

deciding, that the exercise of the option by the trustee to convert the bonds, upon their call for redemption, into new common stock was in fact a purchase, as held by the chancellor.

However that may be, when we consider the exact question here presented—the exercise of this option—the case is made stronger for the trustee. The testator had a large investment in the Woodward Iron Company. He was its founder, with an abiding faith in its success, and an evident pride in its progress. The voting strength of his trust estate is increased by a conversion of these bonds into new common stock, and the retirement of the bonds hastens the day for a dividend payment on this stock—the organization plan postponing such dividends until the retirement of a fixed amount of such bonded indebtedness. Having so great a faith in its financial soundness, it is very natural to conclude that the testator would have given approval to such an exchange; and we think it manifest from all the surrounding facts and the broad discretion vested in the trustee by the language of the codicil, that the trustee acted well within its authority under that instrument in exercising the option of exchange as was done.

The conversion of the old bonds into the new was more or less an involuntary matter on the part of the trustee, and in exercising the option and accepting the new common stock upon the redemption call of these bonds, the trustee was acting within the line and authority of a broad discretion. And in the exercise of this discretion, the life beneficiaries, in our opinion, have no right of interference.

It follows, therefore, as our conclusion that the decree of the chancellor is correct in all matters save and except that part of the decree in which it is held the trustee was without authority to exercise the option upon redemption call of the new income bonds to accept new common stock in lieu of cash. In this respect, the decree will be here corrected and modified to the effect that the trustee had such authority, and properly exercised its discretion in this regard.

As thus modified, the decree will stand affirmed.

Modified and affirmed.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.