STATE EX REL. DUSSAULT ET AL., RESPONDENTS, *v.* FOX MISSOULA THEATRE CORPORATION ET AL., APPELLANTS.

(No. 8,007.)

(Submitted February 26, 1940.   Decided April 26, 1940.)

[101 Pac. (2d) 1065.]

442

*Mr. Howard Toole* and *Mr. W. T. Boone,* for Appellants, sub-
mitted an original and a reply brief; *Mr. Boone* argued the
cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Edward T. Dussault,* County Attorney of Missoula County, and *Mr. Randolph Jacobs,* Deputy County Attorney, for Respondents, submitted a brief; *Mr. Dussault* and *Mr. Jacobs* argued the cause orally.

444

MR. JUSTICE ARNOLD delivered the opinion of the court.

This is an appeal from a judgment of the district court of Missoula county making permanent a temporary injunction which enjoined the defendants from operating and conducting a plan popularly known as "Bank Night." The plaintiffs' theory of the case is that the defendants were maintaining a nuisance as defined in section 11124, Revised Codes, and they sought to abate the nuisance.

The case was tried upon an agreed statement of facts. The essential parts of the plan, as we gather from the agreed statement, are as follows:

The defendant Fox Missoula Theatre Corporation operates two theaters in the city of Missoula, known as the Wilma and the Rialto. One Thomas C. Grindley, who is not a party to this suit, operates a theater known as the Community Theatre. Each week the defendant theater and Grindley deposit $100 apiece in a bank, which sum becomes a prize subject to drawing under the following conditions: The defendants maintain a register where people over sixteen years of age sign their names and set forth their addresses. Each registered name receives a number in regular order. In a second register, known as Register No. 2, the names are alphabetically arranged, retaining the same numbers they have in Register No. 1. Anyone so registered becomes eligible for the prize.

Once each week at the Wilma Theatre numbers corresponding to those set opposite the names of registered persons were placed in a box on the stage. A disinterested person, usually from

the audience, drew at random from the box and the number drawn was read aloud. The person whose number was drawn was the winner of the prize. A period of two minutes was permitted for the person to appear and claim the prize. If the $200 award was not claimed within the allotted time, the money was added to the prize fund until it reached the sum of $500, at which time it was otherwise apportioned. At no time did a single award exceed $200. While it was not necessary for one to purchase a ticket for admission to the theater to become eligible to the drawing, this fact was not announced on the screen, radio or published in a newspaper, but such information was imparted by the door attendant each bank night and at the time of the drawing. On bank night all tickets are sold for the price charged adults, no children's tickets at the usual reduced price being sold. It is conceded by the parties that some theater patrons attend on bank night solely for the chance of winning a prize, while others attend solely for the purpose of seeing the picture.

It is admitted in the agreed statement that the plan was profitable for the theaters and that, if the money were not used for the prize, it would be otherwise used for advertising. On bank night the theaters joining in the plan were virtually filled to capacity with large numbers of persons standing on the outside.

The question for us to determine is whether or not the plan constitutes a lottery under the laws of Montana. While there have been no decisions in our court on this subject, as it relates to so-called Bank Nights, our Constitution, Article XIX, section 2, reads as follows: ''The legislative assembly shall have no power to authorize lotteries, or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state.'' In pursuance of such mandate in the Constitution, the legislature enacted section 11149, Revised Codes, reading as follows: ''A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or interest in such property, upon any

agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." In *State* v. *Hahn*, 105 Mont. 270, 72 Pac. (2d) 459, this court set out the three requisites of a lottery as the offer of a prize, its award by chance, and the giving of consideration for an opportunity to win the prize.

It appears that the defendants admit that all elements of a ▆ lottery are present, except the requisite that there must be a valuable consideration paid for a chance to win a prize. The fact that the scheme was cleverly arranged apparently to avoid the stigma of the statute forbidding lotteries is no defense. Judicial scrutiny must pierce the veil of sham defense, whether it be the product of a mind ingenious or ingenuous, clever or crude.

Defendants, when they argue that the money put up by them for the gifts would otherwise be spent for advertising, step into their own deadfall. Why, then, do they not spend it for advertising? If spent for advertising the attraction for attending the show, and the appeal of the advertisement would be the picture shown, and not the gift offered. The purpose of the gift is a strong factor in determining the nature of the scheme. It would seem that on bank night the remote chance of a smile from lady luck or dame fortune is a greater attraction than the winsome ways of other stars.

Defendants contend that there was *no consideration paid* for participation in the drawing, hence it was not a lottery. Where does the money come from for the gift? From the treasury of the theater. Where does the money come from for the treasury of the theater? From the customers who purchase tickets. Therefore the price paid for the ticket, in part, though disguised, later reappears as the gift. It enters the box office as Dr. Jekyll, and steps out as Mr. Hyde.

The recent work of Williams on Lotteries, in section 185, page 115, has this to say about consideration: "With respect to its office or function this term may denote the element of a consideration in a specific contract such as the purchase price

in the buying of a lottery ticket. This is the narrow, technical use of the word. Or, it may have a wider meaning and refer to all or a portion of the element of consideration in the entire scheme or device. Here it may include all or a part of the consideration involved in all or a part of the contracts between the operator and the players. As to kinds of consideration, there are many, such as money or property paid or promised, time given, labor performed, services rendered, benefits conferred, losses sustained, and detriments endured.''

Where the theater uses a part of the price of the ticket for a plan such as we have here, it is *pro tanto* a reduction in the price for admission and an application of the amount of the reduction toward an accumulating prize.

In *State ex rel. Beck* v. *Fox Kansas Theatre Co.,* .144 Kan. 687, 62 Pac. (2d) 929, 109 A. L. R. 698, it was held under circumstances quite similar to those before us, that the benefit under the ''bank night'' plan in the way of increased gross receipts for paid admissions is sufficient consideration coming directly or indirectly from those entitled to chances generally to meet the element of consideration in the definition of a lottery. (See, also, *Sproat-Temple Theatre Co.* v. *Colonial Theatrical Enterprise,* 276 Mich. 127, 267 N. W. 602; *Society Theatre* v. *Seattle,* 118 Wash. 258, 203 Pac. 21.)

A further analysis of the question of consideration is found in Williams on Lotteries, supra, at page 132, which in several respects is pertinent to the problem before us:

''The Athens theatre has a show to exploit and seats to sell. It makes offers to the public upon certain terms and conditions which contemplate two classes of chances and the members of the public accept these terms and conditions without change. It is the theatre's game and the players have to accept the offers as they are made, if they accept at all.

''It is respectfully suggested that this scheme discloses six kinds of consideration connected with and included in the theatre's offer and the corresponding acceptance of the offer, namely:

" (a) The registrant's time, trouble and expense in going to and from the lobby of the theatre in order to register and receive his option number.

" (b) The registrant's subjection in the lobby to sales appeal of the theatre program by the flaming posters suggesting beautiful scenery, charming women, handsome men and thrilling music —a thing of value to the theatre.

" (c) The addition of registrant's name and address to the theatre's mailing list, a list which is of value and would cost considerable if made in some other manner.

" (d) The registrant's time, trouble and expense in going to and from the theatre in order to participate in the drawing at nine o'clock on 'bank night.'

" (e) The registrant's service to the theatre in 'broadcasting' notice of the scheme to his kin, comrades and acquaintances— a very valuable service since the use of the mails and radio is denied to 'bank night.'

" (f) The admission fee, which, in most cases, is paid by the registrant in order to see the drawing as it actually occurs and to participate most comfortably and advantageously in the distribution, if, as, and when it takes place.

"In view of this analysis several things are obvious, namely:

" (a) That there are two prerequisites for participation in the distribution of prizes: (1) Registration of name and address in a book in the theatre lobby, and (2) attendance at the theatre, either in or out, at nine o'clock sharp on 'bank night,' and that one of these prerequisites is absolutely worthless without the other.

" (b) That there is only one way for the registrant to see the drawing and get first hand information and thereby participate fully in what is done, and this way, this opportunity for visual participation, this chance de luxe, is sold to him in a 25 cent admission fee and all the hocus pocus that 'bank night' promoters can muster cannot obscure the fact.

" (c) That while consideration is present in the scheme in all the kinds and aspects shown in the foregoing analysis, that part which is made up of the stimulated admission fees actually

and undoubtedly received by the theatre, is, in itself, sufficient to constitute the consideration comprehended by the anti-lottery statutes in any state in the Union.

"(d) That another kind of consideration involved in the acceptance which is in and of itself sufficient to supply the element of consideration in a lottery, is the presence of the registrants at the theatre, even on the outside, in response to the operator's offer.

"(e) That the plan of drawing from all registration numbers has the effect of playing the total registration against the attendance and thereby increasing the odds against the award and in favor of passing the prize for addition to the prize for the next Monday night. This, of course, increases the prize without increasing the admission and in so doing accelerates the gambling spirit. Here there is an increase in prize from $35.00 to $210.00 without any award at all. Thus there is no limit to the prize in the 'bank night' scheme and consequently no height to which the gambling fever may not rise under it."

While in the instant case, failure of a number holder to claim the prize will result in adding the prize to the next week's drawing without increasing the individual prize, yet the number of prizes that may be drawn is thereby increased, resulting in greater interest in attendance.

In describing a lottery our statute, supra, in conclusion uses these words: "Whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." Apparently the legislature foresaw clever plans to evade the plain meaning of the law and confuse or befuddle the courts. As was done by this court in *State* v. *Hahn,* supra, we must here look to the substance as well as the form.

The scheme is admittedly arranged for the purpose of attracting money to the theater, by offering a prize to a chance winner, even though the prize might occasionally be drawn by one who has purchased no ticket. It is in effect a spawning ground for more unrestrained forms of gambling, appealing to juveniles as well as adults. That the scheme is artful and difficult of judicial capture is evidenced by the fact that sixteen ju-

risdictions have classified it as a lottery, and about nine have allowed it to depart with judicial blessing. Injunction lies to abate a nuisance such as we have here. (*State ex rel. Stewart v. District Court*, 77 Mont. 361, 251 Pac. 137, 49 A. L. R. 627.) Despite its attractive makeup, we believe the scheme must take its place in the limbo of lotteries.

Judgment affirmed.

ASSOCIATE JUSTICES ANGSTMAN and ERICKSON concur.

MR. CHIEF JUSTICE JOHNSON:

I dissent, and in order to give a true picture of the enterprise in question it is necessary to state the facts more fully than as set forth in the majority opinion. It is shown by the agreed statement of facts that bank night is an advertising plan for the purpose of stimulating public interest and increasing the paid attendance at the three theatres and has proved profitable; that on bank night the same picture is shown as on the preceding or following night, and no additional price is added to the regular admission charge, but that no reduced price children's tickets are sold on bank night; that any person over the age of sixteen years may register free and obtain a number giving him a chance at the drawing without purchasing a ticket, and that the purchase of a ticket does not give him a chance without so registering; that during the entire period of the system it was necessary and possible for any person to register only once, and not once each week; that the average number of persons in front of the theatre on bank night is one thousand; that the drawing is announced at all three theatres and to the crowd in front of each, and two minutes allowed for the winner to appear and claim the award; that the said time is ample for the purpose; that no theatre ticket is necessary in order to register and receive a number or to enter the theatre for the purpose of claiming the award; that the defendant "has given the public notice that a ticket of admission to theatres operated by it was not and is not a condition to participation, by the door attendant at each of said theatres above named, on the night

when 'Bank Night' is operated, and at the time of the drawing, calling out to all persons in front of said theatres the name or names of persons entitled to the awards,'' and ''has advised the public that the registration register is free and open to all persons over the age of sixteen years, by announcements shown on the screen, by sign placed near the registration book, and by oral announcement from the stage of said theatres on 'Bank Night,' '' but ''has not announced on screen, or radio or published in the newspaper that persons registered can participate in 'Bank Night' without purchasing a ticket of admission''; that on bank night there have been many people outside the theatres waiting for the announcement of the award and ''it has sometimes occurred that the award of the 'Bank Night' has been made * * * to persons who had registered in the manner above described, but who had not purchased tickets of admission, or paid any money, either directly or indirectly, and were not in the theatre at the time of the drawing, and who were admitted to the theatre without charge to claim the award''; that during the day preceding any bank night any person who has registered for a number can, without the purchase of a theatre ticket, by writing his name and address on a card available at the Wilma or Community Theatre, participate in the drawing without being personally present in or near any of the theatres when the announcement is made; that many people each week have thus participated without being present at or near any of the theatres at the time of the drawing; and that sometimes the award has been made to persons who had so participated without purchasing tickets of admission or paying any money and who were not at or near any of the theatres at the time of drawing; that many of the people who attend there on bank night do so because of the chance to win a cash prize and not because of the screen program offered, while on the other hand many people attend both to see the program and to participate in the drawing.

Thus it was not the purchase of a ticket, but rather the act of registering, which conferred the right to participate. Furthermore, it was not necessary to be in the theatre or in that vicinity at the time of the drawing in order to participate. The agreed

statement does not say how the participants are divided in numbers between those who purchase tickets and those who do not, nor between those who are (1) in the theatre, or (2) are present nearby, or (3) have signed the cards and are not in the vicinity at all. Probably the majority of those who participate also buy tickets, as otherwise the scheme might have been abandoned, like any advertising or promotion plan which does not bring the desired results. However, the agreed statement of facts amply demonstrates that it is not necessary to buy a ticket or to be present in order to participate. The question is whether this state of facts shows the existence of a lottery, under the Constitution and laws of Montana.

Section 2 of Article XIX of the Constitution of Montana provides: "The legislative assembly shall have no power to authorize lotteries, or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state."

The mention of both "lotteries" and "gift enterprises," and of both "lottery tickets" and "gift enterprise tickets," indicates the disapproval of all schemes for the awarding of prizes by chance "for any purpose," whether the chances are sold for a valuable consideration and thus constitute the enterprise a gamble and therefore a true lottery, or whether they are not sold for a valuable consideration and therefore constitute it no gamble, but merely a "gift enterprise." The purpose of a real lottery is of course the same as that of any other gambling enterprise, namely the direct profit motive, whereas the purpose of a "gift enterprise" is the indirect benefit of stimulating trade.

I am aware that various legislatures and courts have broadened the meaning of "lotteries" to include other than strictly gambling enterprises, in which the purchaser gets nothing but the chance for his money, and to include any awarding of prizes by chance. But it seems obvious that by the constitutional provision quoted above the people have made such construction both unnecessary and impossible.

In section 11149, Revised Codes, "lottery" is defined as follows: "A lottery is any scheme for the disposal or distribution

of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known.''

In that definition the legislature followed the meaning of ''lottery'' obviously intended by the people in the constitutional provision mentioning both lotteries and gift enterprises; namely, as a scheme for the awarding of a prize by chance, ''among persons who have *paid* or promised to pay *any valuable consideration for the chance* of obtaining''' it, etc. The statute goes on to provide that it is still a lottery ''whether *called* a lottery, raffle, or *gift enterprise*,'' etc.; but that does not constitute a prohibition of true gift enterprises, since to come within the definition of lottery some ''valuable consideration'' must have been paid or promised for the chance.

That essential has been recognized by this court in *State* v. *Hahn,* 105 Mont. 270, 72 Pac. (2d) 459. None of the other citations or quotations included in the majority opinion are even remotely in point, since the requirement that valuable consideration must be paid obviously eliminates the applicability of other forms of consideration, such as detriment by reason of the necessity of registering in a book or signing a card.

The record in this case shows that it was not necessary to pay anything for the chance, or even to buy a theatre ticket at the regular price. On the contrary, it does indicate that some tickets might not have been bought, at least on ''bank nights,'' if it had not been for the prize drawing; the majority opinion holds, therefore, that in those instances a ''valuable consideration'' had been paid for the chance.

It seems to me that regardless of supplemental or even primary reasons for buying a theatre ticket other than or in addition to the desire to see the show, what is actually purchased at the regular price is still the theatre ticket and not the chance, and that it is impossible to allocate the consideration paid, or any

part thereof, as consideration for the chance. It might as well be argued that in the ordinary instance a part of the admission price is in consideration of advertising expense, some of the benefit of which accrued to the patron by informing him when the show he desired to see would be available. If, on the other hand, 5 cents extra or some other additional amount had to be paid for the ticket on bank night, and if it were necessary to buy a ticket to participate in the drawing, then it could properly be said that a valuable consideration was paid for the chance.

Point is made of the fact that on bank night no reduced-price children's tickets are sold, and it is assumed that the difference in cost between full-price and reduced-price tickets is a consideration for the chance. However, since the agreed statement shows that the system has worked satisfactorily as a business promotion scheme, there is probably no incentive for offering the reduced-price children's tickets on "bank night." That possibility is at least as reasonable as to assume that the price of children's tickets is raised on bank night so that the children will supply the consideration for the prize to be won by somebody over sixteen years of age. As a matter of fact, the record does not show that children ever buy full-price tickets on bank night, or that children's tickets are ever sold by these theatres at a reduced price on other occasions, or if so, that they are ever sold to persons sixteen or more years of age. That being the case, and since persons under that age are not allowed to participate in the drawing at all, it cannot be assumed that they pay the full price in order to participate, or that by paying the full price on bank night they pay a valuable consideration for their own chance, or the chance of anyone else, to participate in the drawing.

It is not shown how many of those participating in the drawing buy theatre tickets. But even if practically all of them do, and even if each who does so actually pays an ascertainable amount for his chance, it still would not be true that he pays a valuable consideration for it, since it is obtainable free.

As noted above, section 11149 provides that to constitute the enterprise a lottery, valuable consideration must have been paid

or promised for the chance; and, as so limited, "consideration" is defined by section 7503, Revised Codes, as that which is paid to the promisor "as an inducement." It seems clear that even if a portion of the theater ticket's price is allocated as paid for the chance itself, it still is not a consideration for the chance; for it is not paid "as an inducement" for the chance, since the chance is to be had free without buying a ticket at all. What can be obtained free cannot be said to have been induced by a consideration, for the thing does not have to be paid to induce the gift.

The same idea is expressed as follows in 1 Restatement of the Law of Contracts, p. 80, section 75: "Consideration for a promise" is something *"bargained for and given in exchange* for the promise;" and by the following illustration (vol. 1, p. 82): "A promises B $500 when B goes to college. If the promise is not made as an agreed exchange for B's going to college but is reasonably to be understood as a gratuity, payable on the stated contingency, B's going to college is not consideration for A's promise." In other words, if there is no bargain for the chance, and no inducement for it—if the chance is a gratuity because it can be acquired without bargain or inducement, a thing given voluntarily on account of it, as in purchasing a ticket which need not be purchased in order to obtain the chance, is not a consideration for it.

It is no answer to say that most of those who participate in the drawing may actually buy tickets, and that the lack of any such requirement is a mere subterfuge. If that is so, the requirement in the statutory definition of "lottery" that a valuable consideration be paid is a subterfuge; that the same thing is true of the fact that there can be no contract without consideration. The omission of an essential element necessary to convert a gift enterprise into a lottery, or a promised gratuity into an enforceable contract is not a subterfuge. If everyone registered and participated in the drawing without buying theatre tickets "bank night" would probably soon stop; but that does not alter the fact that tickets need not be bought and no expense whatever incurred in order to participate in the drawing, that the

purchase of a ticket is entirely gratuitous, so far as the opportunity to participate in the drawing is concerned, that no valuable consideration is therefore paid for the privilege, and that the enterprise does not constitute a lottery.

Thus it cannot properly be said that those who bought tickets paid a consideration, either for their own chances or for the chances of those who bought no tickets. It seems obvious that this is one of the reasons why our constitutional provision mentions gift enterprises in addition to lotteries. Strictly, it may be a misnomer to say that the legislature "shall pass laws to prohibit the *sale* of lottery or *gift enterprise tickets*," since in the nature of things gift enterprise tickets or chances are given away rather than sold; and it is unnecessary to consider whether the constitutional command to the legislature means to "prohibit the sale *or gift* of lottery or gift enterprise tickets." It is also unnecessary to consider whether the provision that the legislative assembly "shall have no power *to authorize* lotteries, or gift enterprises," means that it shall have no power *to permit them to operate without express authorization;* but certainly it was not contemplated that the legislature would permit to be done that which it could not authorize to be done.

But assuming that the constitutional provision constitutes an express mandate to the legislature to prevent gift enterprises as well as lotteries, or an express denial of power not only to authorize them, but also to tolerate them without authorizing them, the fact that the legislature has failed in its duty cannot justify the court's usurpation of the unused legislative power for that purpose. If any consideration can ever justify such legislation by the courts, certainly this instance is far too trivial to justify it. The people can readily either elect legislators who will carry out the apparent constitutional intent or carry it out themselves through the initiative power. If such a proposal to outlaw gift enterprises of the kind should come before me as a legislator or as a voter I would, in view of the apparent constitutional intent, undoubtedly vote for it, but I cannot do so as a part of my judicial duties as member of this court.

I am thus compelled, for the first time since taking office as a member of this court, to dissent from the majority, and to hold that the judgment of the district court should be reversed.

MR. JUSTICE MORRIS:

I concur generally in the foregoing dissenting opinion of the Chief Justice, but think much more could be said in opposition to the majority opinion.