STATE EX REL. STAFFORD ET AL., APPELLANTS, v.
FOX-GREAT FALLS THEATRE CORPORATION ET AL.,
RESPONDENTS.
(No. 8,306.)

(Submitted September 14, 1942. Decided December 19, 1942.)

[132 Pac. (2d) 689.]

*Mr. John W. Bonner*, Attorney General, *Mr. Fred Lay*, First Assistant Attorney General, *Mr. John D. Stafford*, County Attorney of Cascade County, *Mr. Cleveland Hall*, Chief Deputy County Attorney, and *Mr. Robert J. Nelson*, Deputy County Attorney, for Appellants, submitted an original and a reply brief; *Mr. Lay* argued the cause orally.

56

*Messrs. R. H. Glover, S. B. Chase, Jr.* and *John D. Stephenson,* for Respondents, submitted an original and a reply brief; *Mr. Glover* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Plaintiffs appeal from a decree denying an injunction against defendants. The question is whether "Bank Night," or the awarding of prizes by chance, in the manner followed by the defendants, constitutes a lottery as defined and prohibited by section 11149, Revised Codes, as follows:

"A lottery is any scheme for the disposal or distribution of █ property by chance, among persons who have paid or promised to .pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known."

Since it is apparent that the plan constitutes the offer of a prize and its award by chance, the only question is whether the participants "paid or promised to pay any valuable consideration for the chance of obtaining" the prize.

The cause was submitted to the trial court upon the following agreed statement of facts: "The defendant, Fox-Great Falls Theatre Corporation, leases the buildings * * * from the owners. The buildings each contain a moving picture theatre in the central portion of the building which the Fox-Great Falls Theatre Corporation operates, and additionally contain numerous store and office rooms which the Theatre Corporation subleases to various tenants.

"Said defendant, Fox-Great Falls Theatre Corporation, on each Wednesday purchases a United States Government $50.00 Defense Bond, which it gives away Wednesday evening to any individual who has secured an identification card at any time within the past several years, and whose name is drawn by chance in a drawing held on the stage on Wednesday night. Such identification cards have been available for several years in the lobby of each theatre and also on the outside of the theatre at the front part thereof, on street corners and in various stores in the shopping district, and are and during all

of that time have been available to any person who would take such a card. It is not necessary that a person purchase a ticket or be in the theatre to secure such a card or to win the defense bond. The winning number is announced from the stage by a loud speaker. This number in turn is announced by the ushers in the lobby of the theatre. Then the number is likewise announced by the door man to the outside of the theatre so that anyone on the street within hearing distance may come forward and claim the award.

"If the award is not claimed on Wednesday night, on the succeeding Wednesday night another $50.00 defense bond is added to it. An additional $50.00 defense bond is added each succeeding Wednesday night until the award is claimed by someone. The only requisites for obtaining the award are the following:

"1. The person claiming the award must present an identification card containing the winning number and the person's name within one minute from the time the winning number is last announced.

"2. Identification card must be presented personally by the individual who claims the award.

"It is not necessary that the person claiming the award, if he should be outside of the theatre, purchase a ticket in order to gain access to the theatre for the purpose of claiming the award.

"At various times awards have been won by persons who were not in attendance at the theatre on the evening of the award, but who were outside of and at some distance from the theatre when the award was announced.

"The money that is used for the purpose of purchasing the defense bond is received from the rental of the store and office properties of the defendant corporation in the theatre buildings, and not from the sale of admission tickets to the theatre. The amount charged as rental is not increased or decreased by reason of such awards being taken from the rental fund.

"The identification cards have been distributed to every one

who would take them in the theatre, in the lobby of the theatre, in front of the theatre, on street corners within several blocks of the theatre, in various stores in the business center of Great Falls and in general to as large a number of persons in the community as reasonable facilities for distribution would permit.''

Plaintiffs rely upon the decision of this court in *State ex rel. Dussault* v. *Fox Missoula Theatre Corporation,* 110 Mont. 441, 101 Pac. (2d) 1065, 1066, which case was similar to this case in all essential facts. In neither was it necessary to purchase a ticket of admission to participate in the drawing. The only noteworthy difference is that in the *Dussault Case* the theatre had only one pocket-book, whereas it is stipulated here that: "'The money that is used for the purpose of purchasing the defense bond is received from the rental of the store and office properties of the defendant corporation in the theatre buildings, and not from the sale of admission tickets to the theatre.''

In the *Dussault Case,* supra, this court, by a three to two decision, held the system a lottery upon the following reasoning:

"Defendants contend that there was no consideration paid for participation in the drawing, hence it was not a lottery. Where does the money come from for the gift? From the treasury of the theatre. Where does the money come from for the treasury of the theater? From the customers who purchase tickets. Therefore the price paid for the ticket, in part, though disguised, later reappears as the gift. It enters the box office as Dr. Jekyll, and steps out as Mr. Hyde. * * *

"Where the theater uses a part of the price of the ticket for a plan such as we have here, it is *pro tanto* a reduction in the price for admission and an application of the amount of the reduction toward an accumulating prize. * * *

"The scheme is admittedly arranged for the purpose of attracting money to the theater, by offering a prize to a chance winner, even though the prize might occasionally be drawn by one who has purchased no ticket.''

In the judgment in this case the learned trial judge, after reciting the agreed statement of facts, section 11149, Revised

Codes, supra, and the first paragraph quoted above from the *Dussault Case,* proceeded to say: ''The Dr. Jekyll and Mr. Hyde feature in that case is eliminated in this case by the agreed statement of facts. It is agreed by the parties hereto that none of the money to purchase the prize comes from the box office receipts; that any person, without purchasing a ticket to the theatre, or without paying, or promising to pay, any valuable consideration may participate in the drawing.'' A decree was entered for defendants accordingly.

If the test adopted in the *Dussault* decision is correct and the sole question is whether the prize was purchased out of the ''Jekyll and Hyde'' fund to which the paid admissions have contributed, it is obvious that the judgment here must be affirmed, in view of the stipulation that no part of the prize comes from paid admissions. The *Dussault* decision was based upon that one theory, which admittedly does not apply here. But since in all other respects the cases are substantially similar it is necessary to re-examine that decision to see whether it was based upon the correct reasoning, and whether the result can be sustained upon any other reasoning which will apply to this case also.

By reason of the great diversity of constitutional and statutory provisions relating to the subjects, and because of the great variety of fact situations presented to the courts, it is impossible to lay down an absolute rule as to what constitutes the distinction between lotteries and gift enterprises, and what consideration is necessary to constitute the scheme a lottery. However, it seems clear that in general a plan is considered within a statute against gift enterprises if it involves an award by chance without the consideration necessary to constitute the scheme a lottery. (*Grimes* v. *State,* 235 Ala. 192, 178 So. 73; *Russell* v. *Equitable Loan & Sec. Co.,* 129 Ga. 154, 58 S. E. 881, 12 Ann. Cas. 129.) The statutes of some twenty states expressly outlaw gift enterprises, either by name or by definitions eliminating the necessity for consideration. The statutes of eighteen others do not define lotteries by stating what consideration, if any, is essential. The

statutes of Montana and nine other states expressly include the payment of valuable consideration for the chances as a necessary element, and those are the only states whose decisions are in point here. They will be referred to later.

The question in both this and the *Dussault* case is whether ▮ the participants *paid any valuable consideration* for the chance of obtaining the prize. In the *Dussault Case* it was agreed that while the participants need not buy admission tickets, the scheme was effective as advertising and increased business at the theatre. The court was diverted from the real issues by that fact and in spite of being unable to find actual payment of valuable consideration by the participants it decided that Dr. Jekyll, who went in ostensibly as part of the consideration for the show, helped pay for the prize and was therefore Mr. Hyde, the consideration for the lottery ticket; which is a perfect example of the *non sequitur* so frequent in decisions in this type of case. The majority arrived at that result with considerable difficulty, basing it upon wording in decisions from Kansas and Michigan, in which the statutes forbid gift enterprises as well as lotteries and thus do not require the payment of valuable consideration as an element, and in the case of *Society Theatre* v. *Seattle,* 118 Wash. 258, 203 Pac. 21, which was based, not upon the statute, which is essentially the same as ours, but upon a special city ordinance. The latter made it unlawful to carry on "any establishment or business * * * wherein any property is sold or *disposed of* by chance," thus omitting any requirement that valuable consideration be paid. Accordingly the novel Jekyll and Hyde theory receives no authority from the cases cited, and it receives little more from logic. For the question is not how the prize was paid for, but whether the chances were paid for, which is an entirely unrelated matter.

Although no part of the admission price paid by any patron was even attempted to be traced as consideration for his chance to participate in the drawing, and although it was agreed that those participating need not be patrons at all, the court in effect held that since the prize money came out of the admissions paid

the latter must in some way have supplied the consideration for the chances. The fallacies in this reasoning are apparent. If there had clearly been a valuable consideration paid by the participants for the chances, and the only problem was to find it, the conclusion would be inescapable that it was in the admissions fund, since in the *Dussault Case* there was no other; but that was not the problem, for the question was whether any valuable consideration was paid at all by them for their chances, so as to make the scheme a lottery, or whether there was none paid, so as to make it a gift enterprise. Like a lottery, a gift enterprise must in some way provide the money for the prize or other gift offered, and that money ordinarily must come from business receipts; but obviously that fact does not turn the gift enterprise into a lottery. For the test is whether those participating in the drawing have *paid a valuable consideration* for the chance—in brief, *whether the participants have bought their chances.* That is the sole question, and the source of the money for the prize is immaterial unless the money can be traced as *money paid for the chances,* and not merely as money paid into the business by patrons in general or even by participants in the drawing. It seems obvious, therefore, that where the participants need not be patrons at all, and where no part of the patrons' money is traceable as purchase money for the chances, it is entirely immaterial whether the fund for the prize comes from theatre patrons, store tenants or other sources.

On the other hand, if the participants in the drawing had to be patrons (which was not true in either this or the *Dussault Case*), and if the money paid by them, actually or ostensibly for commodities or services, furnished the fund for the prizes, those facts might justify some *suspicion* that not all they paid was consideration for the theatre tickets, and that part of it was consideration for the chances themselves. But even under those circumstances, it would not constitute *proof* to that effect, since the money paid by patrons also furnishes the fund for advertising and other expenses of doing business, and for the profits, if any. Therefore, without further proof it is equally

possible that some of the latter fund may merely have been diverted to the furnishing of prizes—in other words, that nothing of what the patrons paid was consideration for the chance, but that all of it was the actual consideration for the theatre ticket, even though the prize, like heat and light, was bought with part of it. A fact equally compatible with either of two possibilities obviously tends to prove neither. It necessarily follows that we must reject the reasoning upon which the decision in *State ex rel. Dussault* v. *Fox Missoula Theatre Corporation,* supra, is based, since it does not demonstrate that the participants "paid or promised to pay any valuable consideration for the chance of obtaining" the prize.

As stated above, there are only nine other states in which the statutes are exactly or substantially like ours in providing as an essential test of lotteries the payment of valuable consideration. One of them is New York, in which the court referred to the statutory requirement and held other kinds of consideration insufficient. (*People* v. *Shafer,* 160 Misc. 174, 289 N. Y. Supp. 649, affirmed 273 N. Y. 475, 6 N. E. 2d 410.)

Under a statute not only identical in this respect with ours, but apparently the one from which ours was copied, it was said in *People* v. *Cardas,* 137 Cal. App. Supp. 788, 28 Pac. (2d) 99, 100: "The problem thus narrows itself down to the question: Was a valuable consideration paid for the chance of winning the prize by those who stood to win? Stated another way: *Was anything of value hazarded upon the chance by them?*" Not finding anything of value hazarded, the California court held that an enterprise substantially like the one here did not constitute a lottery under the statute.

The only decision we have found to the contrary in any state with a comparable statute is *State* v. *Danz,* 140 Wash. 546, 250 Pac. 37, 48 A. L. R. 1109. In that case the court, by a five to four decision, held that a similar gratuitous award by chance constituted a lottery. The ruling was based entirely upon language from *Society Theatre* v. *Seattle,* supra, in which, as noted above, the decision turned upon a local ordinance com-

pletely eliminating the element of consideration. The able minority opinion of the other four judges was expressly approved by the California court in *People* v. *Cardas*, supra.

Thus among the only jurisdictions with comparable statutes the majority rule is that enterprises of this kind are not lotteries.

The dissents list nineteen states in which "bank night has been held to be a lottery," and lays that down as the majority rule. Yet each case rests upon its own facts and the law of the jurisdiction, and not upon the statistical preponderance of all "bank night" cases, regardless of statutes and circumstances. Among the nineteen states listed are Montana and Washington, apparently in reliance upon *State ex rel. Dussault* v. *Fox Missoula Theatres Corporation*, supra, whose reasoning is admittedly inapplicable to the facts of this case, and *State* v. *Danz*, supra, which is of little if any valid authority. None of the other seventeen states has statutes similar to ours in the definition of "lottery" or of the consideration necessary.

On various phases of the question the dissents cite decisions from Delaware, Kansas, South Carolina, Texas and Virginia, and federal decisions in cases arising in Iowa and Oklahoma. None of those states except Oklahoma has a statute comparable to ours in requiring the payment of valuable consideration. Two of them expressly forbid gift enterprises. In Oklahoma the statute is practically the same as ours, but in the case cited (*Affiliated Enterprises, Inc.*, v. *Gantz*, 10 Cir., 86 Fed. (2d) 597, 599) the copyright owner of a bank night plan was suing the user of a similar plan for infringement. By its reference to "a lottery or gambling device," the court clearly recognized the legislative intent expressed by the words "pay valuable consideration." Then it is said that the lack of any such requirement in the bank night plan "seems to be a subterfuge to escape the stigma of being a lottery." Without analyzing the statutory definition or even quoting it, the court did assume to find other consideration. But the holding was not that the plan constituted a lottery in spite of the statutory requirement. What the court held was that: "If not within the literal definitions of those vices

[lotteries and gambling], plaintiff's plan and system is too closely akin to have the protection and assistance of a court of equity.'' Certainly that decision is no interpretation of the term ''pay valuable consideration.''

There was some reference in the *Dussault Case* to consideration by way of detriment instead of benefit, but the court naturally did not suggest that by a detriment, such as standing in front of a theatre, or coming in without expense to collect the prize, the participants in the drawing could be said to *pay* a *valuable* consideration—a conclusion made logically impossiblle by common sense and the rule that ordinary words are to be construed ''according to the context and the approved usage of the language.''. (Sec. 15, Rev. Codes.) Context and approved usage are part of the language. ''Pay,'' ''valuable'' and ''consideration'' all have various meanings. But in ''pay a valuable consideration'' the context restricts the meaning conveyed by each. Standing somewhere, or even standing on one's head may constitute consideration for a promise, and may conceivably constitute payment of a bet or even of a lawful obligation; but it cannot be considered as *payment of a valuable consideration,* even though the donor of the prize receives some direct or indirect benefit from it. (*People* v. *Shafer,* supra; *People* v. *Cardas,* supra.)

Many decisions relative to contracts, under the especial circumstances of those cases, speak of ''consideration,'' ''good consideration,'' and ''valuable consideration'' as practically identical in meaning; and often ''to pay consideration'' means to furnish or supply it. But if the context is to be considered, we must assume that to *furnish good* consideration, required as the basis for an enforceable contract (Sec. 7503, Rev. Codes), is not identical with to *pay valuable* consideration for a chance (Sec. 11149, Rev. Codes), required as an essential element of a lottery; for we must presume that the legislature had some reason for the words it used, and that by the difference in words and context it meant to express different ideas. Certainly the terms are not synonymous, and to suffer detriment not describable in

66

terms of value cannot logically be taken as meaning to pay valuable consideration.

Laws can be expressed only in words, and words must be ██ reasonably and logically interpreted according to grammatical and statutory rules if our governmental system is to be, as it was established, one of laws and not of men. The simplest way to make it otherwise is to distort and misconstrue words so as to attribute to them a meaning neither intended by the legislature nor conveyed to normal intelligent persons. We cannot, therefore, construe the words ''to pay any valuable consideration for the chance'' as meaning to suffer such slight detriment as that necessary to participate in the drawing under the facts of this or the *Dussault Case*. If the legislature elects to make such detriment a sufficient consideration, it has the power, and the sole power, so to provide, by means of words which without quibble or subterfuge will convey that meaning; and we must refuse to usurp that power, for no end, however desirable, can justify the means.

In the *Dussault Case* it was stipulated that the participants ██ ██ who bought tickets to be present on ''Bank Night'' paid exactly the same price for which they could see exactly the same show on either the preceding or the following night; it was therefore logically impossible to find that any part of the money paid for the ticket on ''Bank Night'' was consideration for the chance itself. The record in this case does not disclose that the same or an equivalent show is not supplied on bank night as on other occasions, and since the burden is upon the plaintiffs to show payment of valuable consideration for the chance, their case must fail.

But there is an even more compelling point which controls both this and the *Dussault Case,* regardless of the source of the money for the prize, and regardless of the question whether a part of the money paid by each patron for the admission ticket otherwise might possibly be allocated as consideration for the chance to participate in the drawing. That is the stipulation

that it is not necessary to buy a ticket at all in order to participate.

As noted above, section 11149 provides that to constitute the enterprise a lottery, valuable consideration must have been paid or promised for the chance. "Consideration" is defined by section 7503, Revised Codes, as that which is paid to the promisor "as an inducement." It seems clear that even if a portion of the theatre ticket's price might conceivably be considered applicable to the chance itself, it still is not a consideration for the chance; for it is not paid "as an inducement" for the chance, since the latter can be had free without buying a ticket at all,—in other words without any inducement. What can be obtained free cannot be said to have been induced by a consideration, for the thing need not be paid to obtain the gift, and therefore does not induce it.

The point is expressed as follows in 1 Restatement of the Law of Contracts, p. 80, section 75: " 'Consideration for a promise' is something 'bargained for and given in exchange for the promise' "; and by the following illustration (p. 82): "A promises B $500 when B goes to college. If the promise is not made as an agreed exchange for B's going to college but is reasonably to be understood as a gratuity, payable on the stated contingency, B's going to college is not consideration for A's promise." Likewise, if there is no bargain for the chance, and no inducement for it—if the chance is a gratuity because it can be acquired without bargain or inducement, a thing done voluntarily, as in purchasing a ticket which need not be purchased in order to obtain the chance, is not a consideration for it.

It is no answer to say that most of those who participate in the drawing may actually buy tickets; for what may be had free, as a gift, does not become a purchase because most of those receiving it may choose to buy something else, without subterfuge. Nor is it an answer to say that the lack of any such requirement is a mere subterfuge. If that is so, the requirement in the statutory definition of "lottery" that a *valuable*

consideration be *paid* is a subterfuge; and the same thing is true of the fact that there can be no contract without *good* consideration. The omission of an essential element necessary to convert a gift enterprise into a lottery, or to convert the promise of a gift into an enforceable contract, is not a subterfuge. If everyone accepted free chances and participated in the drawing without buying theatre tickets ''bank night'' would probably soon stop; but the circumstance would prove, not that it had been a lottery, but that it had not had the desired result of increasing business. Certainly it would not alter the facts that tickets need not be bought and no expense whatever incurred in order to participate in the drawing, that the purchase of a ticket is entirely immaterial and gratuitous so far as the opportunity to participate in the drawing is concerned, that no valuable consideration is therefore paid for the privilege, and that the enterprise does not constitute a lottery.

Finally, the plaintiffs argue that those who buy theatre tickets ''pay for any chance any one outside may have to win,'' and they cite the decision of one court to that effect. But our statute provides that a lottery is a scheme to award the prize by chance ''among *persons who have paid* * * * valuable consideration for the chance.'' Obviously, an agent may pay valuable consideration for another, but may an unauthorized person be said to pay valuable consideration for another, without privity? Where no payment of valuable consideration is required in order to participate or win, it is pointless to argue that by accepting the chance or the prize, he who has not paid valuable consideration ratifies payment for him by strangers; and since, under those conditions, according to the universally accepted definition, the strangers have not paid valuable consideration for even their own chances it is doubly pointless to argue that they have paid such consideration for the chances of others.

In *People* v. *Cardas,* supra, it was argued, as in these cases, that by increased business the operator received the necessary valuable consideration, and the California court said, under the statute from which ours was copied verbatim as to the

required consideration: "Counsel for the people argue that patronage from the ticket holders as a whole constituted consideration for the distribution of the prizes, even though the individual holders of tickets had not parted with consideration for the individual ticket held by them. This argument apparently proceeds upon the theory that the element of consideration is established by showing that the defendant received something of value in return for the distribution of the prizes. The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize. They did not hazard anything of value. It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office, but from another employee, could not be said to have paid a consideration for the prize tickets since they could have received them free."

It was suggested in the *Dussault* decision that "in describing ▇ a lottery our statute, supra, in conclusion uses these words: '·Whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known.' " But by that addition the legislature did not attempt to define gift enterprises as lotteries by eliminating the requirement that valuable consideration be paid for the chance to participate; it meant only what it said,—that if the elements were present to make it a lottery, it was forbidden, whether it was *called* a lottery, raffle, or gift enterprise. The converse must, therefore, be equally true, that if it is a gift enterprise because valuable consideration is not paid, it is not unlawful even if someone chooses to *call* it a lottery.

Ignoring the fact that if none of the participants need buy ▇ theatre tickets, those who voluntarily choose to do so cannot properly be said to have paid consideration for their chances, the minority opinion advances another contention which

was neither suggested nor argued by the litigants. The contention is that by giving away the numbers, the defendants have violated section 11151, Revised Codes, which makes it unlawful to give or transfer a ticket representing any "interest in, or depending upon the event of any lottery." But that begs the entire question, which is whether the plan constitutes a lottery under section 11149, which with sections 11150 to 11158, inclusive, comprises the chapter enacted to prevent lotteries. Obviously if the plan constitutes a lottery it is a violation of section 11151 to give away tickets. But what defendants are accused of here is not giving away lottery tickets, but of keeping, maintaining and operating a lottery. That is what the pplaintiffs must prove; *unless* they prove the lottery they cannot prove the giving away of lottery tickets; in either event the question of gifts is immaterial here.

It was not argued in either this or the *Dussault Case* that ▇▇ ▇▇ our constitutional provision concerning lotteries and gift enterprises is self-executing. The only suggestion to that effect is its quotation, followed by its characterization, without argument or authority, in the last two lines of appellants' reply brief in this case, as "A mandatory, self-executing constitutional provision *prohibiting* lotteries or *gift enterprises*. for any purpose."

In spite of the absence of any serious argument upon the point, the dissent is based largely upon it. We shall therefore examine the constitutional provision to see whether it can be considered *self-executing* as a prohibition of gift enterprises. It is section 2 of Article XIX, and reads as follows:

"The legislative assembly shall have no power to authorize lotteries, or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state."

The minority misconstrue this provision in at least two respects. In the first place, they construe the first part as forbidding lotteries and gift enterprises, whereas what is forbidden is legislative authorization of them. That such provisions are

identical in meaning can be based only on the premise, inadmissible under popular government, that all rights are derived from the state, and that everything is forbidden except what is expressly authorized by law. Not even the most complete bureaucracy or other authoritarian government has yet gone so far as that. Even under such governments every citizen does many things which are not expressly authorized by law or decree, and it has not been contended that everything which the legislature has not expressly authorized or cannot expressly authorize is unlawful. Certainly there was no common law against lotteries; and it has even been held on good authority that while they may be made *mala prohibita,* they are not *mala in se.* (*Stone* v. *Mississippi,* 101 U. S. 814, 25 L. Ed. 1079.)

On the other hand, there is a well-known historical reason for this particular form of constitutional inhibition; and that is that occasionally legislatures had expressly authorized lotteries for public or charitable purposes, as in the Louisiana Lottery, thus in effect putting the state into the business or at least lending its express sanction to it. But whatever the reason, the inhibition is directed against the legislative power and against only that.

It is significant that whenever the provision was intended to be self-executing as a direct inhibition of lotteries or gift enterprises, no difficulty was found in expressing that intent. Thus, the constitutions of nine states, Delaware, Florida, Georgia, Kansas, Kentucky, Louisiana, Ohio, Oregon, and Rhode Island, provide that "the sale of lottery tickets and all other forms of gambling," or "lotteries," or "lotteries and gift enterprises," or "lotteries and the sale of lottery tickets" are "prohibited" or "forbidden" or "shall be prohibited in this state," Rhode Island excepting "those already authorized by the General Assembly." Obviously such provisions are self-executing. The Mississippi, and South Carolina, provision is that "no lottery shall ever be allowed * * * or its tickets be sold," which seems self-executing as to the sale of lottery tickets. The same is true of the New Jersey provision, which is that "no

lottery shall be authorized by the legislature or otherwise in this state, and *no ticket in any lottery shall be bought or sold.*"

The constitutional provisions of some ten other states are identical or substantially identical with ours, combining commands of and restrictions upon legislative action, most of them mentioning gift enterprises as well as lotteries. The Texas provision commands the legislature to pass laws prohibiting lotteries and gift enterprises. The constitutional provisions of some fourteen others constitute restrictions upon authorizing lotteries, or lotteries and gift enterprises, or upon authorizing lotteries and authorizing, allowing or permitting the sale of lottery tickets. Practically all of the latter provisions appear in the portions relating to the legislative branch, but wherever they appear they apply to that branch, which is the basic branch of popular government and has the legislative power. In so far as they prohibit legislation they are self-executing as to that prohibition, since nothing the legislature may do can change them; but they cannot be held self-executing as themselves outlawing lotteries. The obvious meaning of the words cannot be ignored in order to attain a short-cut, however desirable the end. Unless words have lost all meaning, it is utterly impossible to find the same intent in the prohibition of power to authorize lotteries as in the direct prohibition of lotteries, and we have found no decision which expresses that interpretation of the words.

Having misconstrued the first clause as a self-executing ban of lotteries and gift enterprises and not merely of legislation authorizing them, the minority proceeds to the second misconception,—that the next clause is intended merely to require the legislature to add criminal penalties. Thus they argue that the provision without further legislation makes gift enterprises "unlawful but not punishable as a crime," and that an injunction against them can therefore be had in actions of this kind.

The provision does not do two things: (1) forbid lotteries and gift enterprises, and (2) command legislative action concerning them. There is only one subject, and that is legislation, some forbidden and some commanded. The two phases of the subject

are not separate, but correlative and reciprocal. The prohibition and the command go together, for they relate to the same subject and are expressed with the same breath and in the same sentence; we cannot put a period after the first clause.

The minority cite the text book statement that prohibitory provisions are self-executing in the absence of the expression of contrary intent. But they fail to state that it is self-executing as to the thing prohibited; thus the rule is stated clearly in *Wren* v. *Dixon,* 40 Nev. 170, 161 Pac. 722, Ann. Cas. 1918D, 1064, that "prohibitory provisions in a Constitution are usually self-executing to the extent that *anything done in violation of them* is void." Here the prohibition is of certain legislation, and there is no complaint that the legislature has acted in violation of that prohibition.

There are a number of minor tests whether and to what effect a constitutional provision is self-executing, but the fundamental test is well stated in *Broderick* v. *Weinsier,* 161 Misc. 820, 293 N. Y. Supp. 889, 901, as follows: "The question in every case is whether the language of a constitutional provision is addressed to the courts or the legislature,—does it indicate that it was intended as a present enactment, complete in itself as definitive legislation, or does it contemplate subsequent legislation to carry it into effect? This is to be determined from a consideration both of the language used and of the intrinsic nature of the provision itself. If the nature and extent of the right conferred and of the liability imposed is fixed by the provision itself so that they can be determined by the examination and construction of its own terms, and there is no language used indicating that the subject is referred to the legislature for action, then the provision should be construed as self-executing, and its language as addressed to the courts." Is the language addressed to the courts or to the legislature? If addressed to the legislature it is not self-executing except as a prohibition of the legislative power which is the subject of the provision. If addressed to the courts, it is because by it certain rights are definitely established, as in the Fifteenth Amendment to the

United States Constitution, infra, or because by it certain things are definitely forbidden so that the courts' judicial action can be based upon it alone.

By the first clause the people denied the legislature the power to authorize gift enterprises as well as lotteries; and by the second clause they commanded the legislature to pass laws "to prohibit" the *sale* of lottery or gift enterprise tickets. We shall assume, without deciding, that the intent of the command was that the legislature should prohibit the *presentation* of gift enterprise tickets, since such tickets differ from lottery tickets in that they are presented rather than sold.

"Self-executing" is a term the meaning of which hardly permits much argument. 16 C. J. S. Constitutional Law, p. 98, sec. 48; defines it as follows: "A provision is self-executing when it can be given effect without the aid of legislation and there is nothing to indicate that legislation is contemplated in order to render it operative; * * * constitutional provisions are self-executing when there is a manifest intention that they should go into immediate effect, and no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed."

Our constitutional provision is that the legislature "shall pass laws to prohibit" what it is here sought to prevent by injunction. Can we seriously contend that in the constitutional provision "there is nothing to indicate that legislation is contemplated," and that "no ancillary legislation is necessary to * * * the enforcement" of the provision?

The rule as stated in 11 Am. Jur. 688, section 71, distinguishes between provisions which are self-executing and those which are not, and it is striking how exactly the description of those which are not self-executing fits the provision under consideration here. The statement is: "Although a Constitution is usually a declaration of principles of the fundamental law, many of its provisions being only *commands to the legislature* to carry out the purposes of the framers of the Constitution or *mere restrictions upon the power of the legislature* to pass laws,

it is entirely within the power of those who establish and adopt the Constitution to make any of its provisions self-executing.''

Is our provision anything more than commands to the legislature and restrictions upon its power with reference to the subject? There seems no room for argument.

It is interesting to note that except for immaterial changes in punctuation and in the position of the phrase ''in this state,'' and the substitution of ''legislative assembly'' for ''legislature,'' our constitutional provision was apparently copied verbatim from section 26 of Article IV of the Constitution of California.

Prior to our adoption of that provision it had been held by the California court in *Hyatt* v. *Allen,* 54 Cal. 353, that self-executing constitutional provisions are those which do not require subsequent legislation to enforce or execute them. (See, also, 5 Cal. Jur. 576ff, Secs. 19, 20, 21.)

The case of *People* v. *Settles,* 29 Cal. App. 2d Supp. 781, 78 Pac. (2d) 274, 276, shows that the courts consider the constitutional provision, not as a self-executing prohibition of lotteries, but merely as a command to the legislature, saying: ''The law prohibiting lotteries is a part of the Penal Code, enacted by the state Legislature in its exercise of the general police power of the state and *in obedience to a constitutional mandáte* found in section 26, Article 4 of our State Constitution.''

In the California constitutional section there follows a provision that certain contracts for sales of corporate stock ''shall be void,'' without any reference to legislation. With regard to that provision the court said in *Sheehy* v. *Shinn,* 103 Cal. 325, 37 Pac. 393: ''It declares that certain contracts shall be void, and that any money paid in pursuance of them may be recovered back by the party paying it, in any court of competent jurisdiction. The provision is evidently self-executing, needing no act of the legislature to give it its intended effect.''

Two especially applicable cases are found in the Louisiana and New York reports. Section 8 of Article 19 of the Constitution of Louisiana provides: ''Gambling is a vice and the Legislature shall pass laws to suppress it.'' The court said in

*State* v. *Mustachia*, 152 La. 821, 822, 94 So. 408, 409: "The provision is not self-operating, and gambling is a crime only to the extent to which the Legislature has declared it [to be] so." On the other hand, the same section provides: "Lotteries and the sale of lottery tickets are prohibited," which is clearly self-executing.

A provision substantially like ours in combining a denial of power with a command of legislative action is section 9 of Article 1 of the Constitution of New York, which provides in part: "Nor shall any lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section." The court said, in *Beach* v. *Queens County Jockey Club*, 164 Misc. 363, 298 N. Y. Supp. 777, 782: "The provisions of the Constitution respecting gambling are not self-executing. Enforcing acts by the Legislature are necessary." The court then added some words which the minority cite as authority for the view that despite the direct decision that the provision is not self-executing, still it is self-executing for injunction purposes; but that was what was sought in that case, and the court refused it.

Some few decisions can be found apparently to the contrary, but they either refer to substantially different constitutional provisions or are not sufficiently persuasive to induce us to abandon the clearly logical majority rule. For instance, the dissent cites *Bass* v. *Mayor of Nashville*, 19 Tenn. 421, Meigs 421, 33 Am. Dec. 154, which says of a similar constitutional provision, totally without analysis, reasoning or citation of authority and without relevancy to the question involved, "this was itself a prohibition." But the question there was not whether the provision was self-executing, but whether in spite of it and of subsequent legislation passed in accordance with it, a lottery authorized by the legislature prior to the Constitution of 1839 was lawful. Plaintiff sought by bill in equity to compel the lottery commissioners to proceed with the lottery and the court

refused to do so, saying that it would have subjected all concerned to indictment under Chapter 47 of the Act of 1835.

The same is true of *State* v. *Woodward,* 89 Ind. 110, 46 Am. Rep. 160; in which the court said that the provision "no lottery shall be authorized, nor shall the sale of lottery tickets be allowed," was an absolute prohibition of lotteries. But the matter was not in point, since the defendant was being prosecuted for selling lottery tickets in violation of section 2077 of the Revised Statutes of 1881, and not in violation of the constitutional provision. Defendant raised the defense that he was selling lottery tickets for Vincennes University under a special territorial Act of 1807. The court held, under the authority of *Stone* v. *Mississippi,* 101 U. S. 814, 25 L. Ed. 1079, that the territorial Act conferred merely a license and not a vested interest, and that the state had the right by Constitution and statute to terminate the license.

The dissent also cites *City of Seattle* v. *Chin Let,* 19 Wash. 38, 52 Pac. 324, as saying of a like provision, "The language of the constitution is mandatory, and the provision is self-executing." But the court did not say that it was self-executing as a prohibition of lotteries, for that was not the question, but merely that it was self-executing as a prohibition of legislative authorization of them. The legislature had passed an act forbidding lotteries with the proviso that "nothing herein contained shall apply to any lottery for charitable purposes." (Pen. Code Sec. 139, Vol. 2, Hill's Ann. St. & Codes.) Under a city ordinance, the defendant had been convicted of maintaining a lottery, and he appealed upon the ground that the ordinance was void because it disregarded the legislative exception. The court held that the language was self-executing in denying the legislative power to authorize any lotteries, and therefore that the legislative proviso was void and had no effect upon the ordinance. But that is far from holding that the constitutional provision was self-executing as a prohibition of lotteries, which was not in issue in the case, since the prosecution was under the ordinance.

*Dombrowski* v. *State,* 111 N. J. L. 546, 168 Atl. 722, is cited

by the dissent. The constitutional section relative to lotteries and other gambling said that "the remedy, penalty or punishment now provided" for such offenses should not be diminished. The defendants were convicted under an Act providing a lighter penalty, which was held void. In other words, the provision quoted above was held self-executing as a limitation of legislative power, and not as prohibition of lotteries, which was not presented by the case. *Silberman* v. *Skouras Theatres Corp.*, 11 N. J. Misc. 907, 169 Atl. 170, turned upon the same point. What application either case has to the question here is not apparent.

In *White* v. *White,* 230 Ala. 641, 162 So. 368, 372, the court said with reference to a provision forbidding certain legislation: "This section of the Constitution is not only a limitation on the power of the Legislature, but its provisions declare and establish the public policy of the state * * *." No analysis, reasoning or citation on the point was given, and it was not suggested that a constitutional provision is self-executing merely because it declares the public policy of the state, which is of course untenable.

In *City of Wink* v. *Griffith Amusement Co.*, 129 Tex. 40, 100 S. W. (2d) 695, 701, also without analysis or citation, the court said, with reference to the constitutional provision, (Vernons Ann. St. Const. Art. 3, Sec. 47), that "the Legislature shall pass laws prohibiting the establishment of lotteries" and other activities: "Being condemned by the Constitution, it is against the 'public policy of the State.'" In that case the Amusement Company sought and was granted an injunction against a city ordinance relating to the subject, and the city by cross-suit asked an injunction against plaintiff's violation of the ordinance. On appeal the court held the ordinance void for reasons not here material, and refused to enforce it against plaintiff; however it refused plaintiff an injunction against the city upon the ground, not that plaintiff had violated a self-executing constitutional provision, but that its activity was against the "public policy of the State" and therefore that plaintiff did not come

into court with clean hands and was not entitled to equitable relief.

In *State* v. *Schwemler*, 154 Or. 533, 60 Pac. (2d) 938, the defendant was convicted of promoting a lottery, made a criminal offense under section 14-801 of the Oregon Code. His defense was that he had been licensed by the city to conduct a "dart game," pursuant to an enabling statute by the legislature. The court held that the game constituted a lottery and that the enabling statute and the license were therefore void. It did not pronounce the constitutional provision self-executing as preventing lotteries, since it upheld defendant's conviction under a criminal statute; but in an injunction case it might well have done so in the absence of a statute, since the Oregon constitutional provision (Sec. 4 of Article 15) provides: Lotteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal laws.' Our provision contains no such prohibition.

Certainly it is not analogous to the provision of the Fifteenth Amendment of the United States Constitution that the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, "on account of race, color, or previous condition of servitude"; for the latter includes the definite expression of a right to citizens as well as a definite prohibition to legislatures. It was held in *United States* v. *Reese*, 92 U. S. 214, 23 L. Ed. 563, that the amendment gave citizens a new right not theretofore had—the freedom from certain discriminatory limitations of the franchise. It was therefore self-executing as to the new right, no further legislation being necessary to enforce the right. But the same is not true as to our constitutional provision in question, which is similar to that, not in granting a right, but only in forbidding certain legislation, and is self-executing only in that respect.

Presumably the form of our constitutional provision resulted from the following of the California provision; but regardless of the reason we must take it as we find it. Consequently the remedy lies, not with the courts, but with the legislature. Cer-

tainly if the latter desires to make gift enterprises unlawful there is no reason why it cannot do so. But the courts have not the right to do so, by the expedient of purporting to find, contrary to the facts, that the participants have paid a valuable consideration for the gratuitous chance to participate.

We agree, of course, that the constitutional purpose should be obeyed; but so should the more fundamental constitutional purpose that the legislative function be not usurped by the judicial branch. Courts must apply the law as they find it, and any feeling courts may have concerning the legislature's failure to extend it to gift enterprises cannot be allowed to influence their decision whether a scheme involves the payment of valuable consideration for the chance, so as to constitute a lottery, or whether it does not involve the payment of valuable consideration and therefore constitutes merely a gift enterprise. The same courts, which in a contract case would have no hesitancy in declaring the absence of the required consideration, should not in a lottery case have any hesitancy in declaring it. But many decisions in this class of cases reproachfully or indignantly characterize as a subterfuge the absence of the requirement to pay valuable consideration to participate in the award. Yet the subterfuge is not the omission of an element essential to lotteries; the subterfuge is in assuming to find it when it is not there. Regardless of the motive for the omission, if the element is not there, the scheme is not a lottery, either under the statutory definition or the customary one. Every child knows that to participate in a lottery. or a raffle, he pays for his chance and gets exactly that for his money;—in other words, that he gambles by paying a small amount of money or other valuable thing in the hope of winning something of a greater value.

There have been many subterfuges to conceal real lotteries, as where some piece of relatively trivial or unwanted merchandise is delivered as ostensible consideration for the money paid; like the beggar's pencil, such subterfuge fools no one. But where the business is a legitimate one, and the purpose is to advertise or develop that business, and the price of the

commodity or service sold is not increased nor the commodity or service measurably cheapened, all of what the patron pays is obviously consideration for the commodity or service itself. Therefore, under those circumstances, no part of the money paid can be held consideration for the chance itself, the burden to prove which is on the plaintiff; and the scheme cannot be held a lottery. It would not even seem material whether some patrons might not have purchased tickets if the prize had not been offered; for they purchased an actual commodity or service at the regular price, without subterfuge, and received that article. The fact that with it they received gratuitously something extra, whether a chance to participate in the drawing, or an oatmeal dish, did not make part of the money paid a valuable consideration for the gratuitous thing received, regardless of the pocket or fund out of which the donor acquired the prize or the dish. Consequently if the extra thing was a chance to win a prize, the plan did not become a lottery. On the other hand, if what was actually bought and sold was the chance on the drawing, and the theatre ticket, like the beggar's pencil, was merely a subterfuge, or if the commodity or service actually sold was measurably cheapened or the price was raised when the chance was given with it, then the plan was a lottery. That is what the burden is on plaintiff to prove, and it should be readily provable, if true.

From what has been said it is apparent that the decree appealed from in this case reached the correct result. The decision in *State ex rel. Dussault* v. *Fox Missoula Theatre Corporation* is hereby expressly overruled, and the decree appealed from in this case is hereby affirmed.

MR. JUSTICE ANDERSON concurs.

MR. JUSTICE MORRIS:

I concur in the foregoing opinion with emphasis on the question of consideration for the chance to win the prize. While I concur in what is said as to the constitutional question

whether section 2 of Article XIX is self-executing, I do not regard that question as of same importance here as the question of consideration.

"It is quite generally recognized that there are three elements necessary to constitute a lottery: First, a prize to be given; second, upon a contingency to be determined by chance; and, third, to a person who has paid some valuable consideration or hazarded something of value for the chance." (*State* v. *Hundling,* 220 Iowa 1369, 264 N. W. 608, 609, 103 A. L. R. 861.) That is a leading case and for logic and sound reasoning it is unsurpassed.

A period of time, such as the time necessary for one to be at the place and within the time necessary to claim the prize, was never accepted as a valuable consideration in any kind of agreement until some courts found it necessary to go beyond all former adjudications wherein the question of consideration was involved, in order to bring Bank Night cases within the established rules of law relating to lotteries. Nor has the communistic idea that a part of the entire amount of money received by a theatre from the whole crowd present shall be held as having been given by the party who received the prize ever found lodgment in our laws until all rational rules of statutory construction were sacrificed so that Bank Night prizes could be classed as lotteries. Attempt has been made to separate "lotteries" from "gift enterprises." Our legislature clearly intended by the enactment of section 11149, Revised Codes, to place the two in the same category. Chapter 31 of the Penal Code is entitled "Lotteries," and that chapter contains all the statutes relating to lotteries and gift enterprises that we have, and section 11149 is a part of that chapter.

Our section 11149 goes further in defining lotteries than the *Hundling Case* mentioned, by using the phrase "persons who have paid or *promised to pay* any valuable consideration for the chance."

In any law relating to gambling, or relating to the consideration to be paid in any contract or understanding between

parties, the consideration shall be gauged in "money," the medium of exchange in the business world. (Sec. 7509, Rev. Codes.) Gambling will never become a menace to the morals of our people where the consideration for the chance taken is not so much money. Carrots and spinach have some value, but one never heard of a gambler wagering such property on the turn of the roulette wheel, or piling a sack of potatoes or a fat pig on a poker table in exchange for a stack of chips. Money is the gambler's medium of exchange. The irrational rules laid down in some cases in a search for a "consideration," given by the party who wins the prize at a Bank Night show, has been stretched to the point of utter absurdity. Legislatures have the power to ban Bank Night prizes if that branch of the government so desires, and there is no necessity for the courts to stultify themselves by exercising the legislative power reserved to another branch of government.

I concurred in the dissenting opinion of the Chief Justice in the former case of *State ex rel. Dussault* v. *Fox Missoula Theatre Co.*, 110 Mont. 441, 101 Pac. (2d) 1065, and now concur in overruling that case.

MR. JUSTICE ERICKSON:

I dissent. It is my view that under our statutes participants in the Bank Night scheme in Great Falls do pay a valuable consideration. The inference that must be drawn from the view expressed in the above opinion is that in order for a consideration to be valuable, under the lottery statute, it must be in money or its equivalent. The opinion restricts the meaning of the words "valuable consideration" beyond anything that the legislature contemplated. Had the legislature intended that a scheme such as this could not be a lottery, unless money or its equivalent was paid in consideration, it certainly would not have used the broad and all inclusive word "any" in describing the consideration. The meaning of this language is that if a participant furnishes anything of value to the operator of the scheme, as the price for the right to participate in the drawing,

then the scheme is a lottery. Many courts have considered this general question. Our own court in the recent case of *State ex rel. Dussault* v. *Fox Missoula Theatres Corp.*, 110 Mont. 441, 101 Pac. (2d) 1065, found no difficulty in finding consideration. That decision is of course expressly overruled by the majority in the present case.

In my view, we need look no further for consideration than the requirement on the part of the operator that every participant be present at the theatre, either inside as a paid guest or outside in the lobby, one minute after the winning number is announced to claim his award. The majority places too much emphasis on the fact that tickets are distributed to participants without cost. The tickets are merely a means of identification, and they are so designated. Mere ownership of a ticket gives the individual no right in the drawing. The thing that gives the participant the right in the drawing is his possession of the ticket plus his presence at the theatre. Without the latter feature, no one may participate or have any right to participate in the drawing itself. The thing that the theatre bargains for is the presence of the individual at the theatre at the appointed time. This is of course of value to the theatre in that the individual, in all probability, will purchase a ticket to attend the show on the particular night in question. And if not that, that he will be present in the lobby or near it so that he may see the advertising, etc. At any rate, the theatre feels that his presence, either in the lobby or within the theatre itself, is of sufficient value so that it bargains for it. Presence at the theatre of itself, under the circumstances here appearing, is without question consideration sufficient to support the contract. (See 1 Williston on Contracts, sec. 112, p. 232; *Maughs* v. *Porter*, 157 Va. 415, 161 S. E. 242.)

The New York courts have held that presence at the theatre is not sufficient consideration for an indictment for operating a lottery. However, in the recent case of *Simmons* v. *Randforce Amusement Corp.*, 162 Misc. 491, 293 N. Y. Supp. 745, a judgment was affirmed allowing recovery under the contract to a

participant who was present with the winning number after the theatre refused to pay him the amount advertised.

But the majority implies that by the use of the word "valuable" before the word "consideration," the legislature expressed the intention that the ordinary contract rules as to consideration should not apply in determining whether or not a scheme is a lottery. With this view I do not agree. How shall we measure consideration in a particular case to determine whether or not it is valuable? The only method that has ever been suggested is that applied in the law of contracts. First, under section 11149, Revised Codes, we must determine the question of the existence of detriment on the part of the participant. There can be no question here but that presence at the theatre at the appointed time is a detriment to the participant. The second test concerns whether or not the consideration is of value to the operator of the scheme. The universal rule is that a consideration is a valuable one if it is the thing for which the promisor bargains. The only inquiry the courts will make is: Does the promisor get the thing which he asks for as a condition upon which his promise shall become operative? If so, then the consideration is valuable. (1 Williston on Contracts, sec. 112, p. 232.) . That rule is applied to lotteries in *Affiliated Enterprises* v. *Waller*, 1939, 1 Terry 28, 40 Del. 28, 5 Atl. (2d) 257.

Nor does the use of the word "paid" indicate an intention on the part of the legislature to define "consideration" differently in the lottery statutes from the ordinary definition to be found in the law of contracts. The use of the word "paid" does not indicate that in paying, cash or its equivalent must be used. To pay merely means to discharge an obligation, and an obligation may be discharged in any manner to which the parties agree. The obligation of the participant here, according to the terms of the agreement, is to appear at the theatre at the appointed time. When he does this, he has discharged his obligation to the operator and is entitled to participate in the drawing.

The opinion follows the minority view as to Bank Night.

The English courts and the federal courts hold without exception that Bank Night and similar schemes are lotteries, and that participants pay a valuable consideration for the right to participate. (*Willis* v. *Young,* 1 K. B. 448; *Central States Theatre Corp.* v. *Patz,* D. C., 11 Fed. Supp. 566; *Affiliated Enterprises, Inc.,* v. *Gantz,* 10 Cir., 86 Fed. (2d) 597.

In discussing the decisions of the various states holding Bank Night to be a lottery scheme, the opinion suggests that the statutes either are silent on the matter of consideration or that their wording is different from ours. While some courts have held, in holding Bank Night to be a lottery, that benefit to the operator is of sufficient consideration to support a lottery, ordinarily either by statute or by rule of court, the common law definition of a lottery, which is the same as our statutory definition, that is, that a valuable consideration must be paid for the right to participate, is adopted as the guide. There are so many cases holding Bank Night to be a lottery that it is impossible and impractical to list them all here. But see *State ex rel. Beck* v. *Fox Kansas Theatre Co.* 144 Kan. 687, 62 Pac. (2d) 929, 109 A. L. R. 698; *City of Wink* v. *Griffith Amusement Co.,* 129 Tex. 40, 100 S. W. (2d) 695, and *Affiliated Enterprise* v. *Waller,* supra; *State ex rel. Dussault* v. *Fox Missoula Theatres Corp.* supra.

Bank Night has been held under varying statutes to be a lottery by these states, among others: Alabama, Delaware, New Mexico, Vermont, Georgia, Pennsylvania, Texas, Nebraska, Ohio, Connecticut, Florida, Illinois, Louisiana, Massachusetts, Michigan, Montana, Oregon, Wisconsin and Washington.

The opinion emphasizes that since participation may be had by everyone without paying the price of admission, it cannot be a lottery and it is immaterial that a greater number of participants do buy tickets. That suggests the inquiry which practical men must make: If no one bought tickets to the theatre on Bank Night, or if patronage at the theatre were not substantially increased, how long would this scheme last? Viewed in the most charitable light, this thing cannot be classed as an

innocent advertising scheme merely because some participants do not pay the price of admission, but instead, viewed as a whole, this scheme, as most courts hold, is a clumsy attempt to evade the lottery statutes by the poorest kind of camouflage, and the great majority of courts have no difficulty in recognizing its true character.

In none of the states holding that Bank Night is a lottery is there found a statutory provision such as our section 11151, Revised Codes: ''Every person who sells, gives, or in any manner whatever furnishes or transfers to or for any other person, any ticket, chance, share or interest or any paper, certificate or instrument purporting or understood to be or to represent any ticket, chance, share or interest in, or depending upon the event of any lottery is guilty of a misdemeanor.'' If we grant, for the purpose of argument, that only those who have paid an admission to the theatre on Bank Night have paid a valuable consideration under section 11149, Revised Codes, then in so far as those participants are concerned who have not actually paid the price of admission, section 11151 applies. The operator has violated this section by *giving* to those participants, under the majority theory, a ticket which entitles them to share in the lottery drawing. In other words, the lottery is established by the fact that those within the theatre have paid a consideration for their right to participate in the disposal of the property, and this being so, section 11151 makes it equally unlawful to give, without consideration, tickets to those on the outside.

The legislature apparently anticipated schemes like this where it is argued that technically the plan is not a lottery, as all need not pay money to participate and, in an attempt to forestall such an argument, put in this section. The broad language of this section and of sections 11152 and 11156 show a legislative intent that the scheme should be looked at realistically and as a whole, and if in actual operation it was a lottery it should be outlawed no matter what legal and technical subterfuges are used to conceal its true nature.

In view of the fact that the majority has declared the con-

stitutional provision not self-executing, I feel it necessary to discuss this matter at some length. If the majority is right, the legislature could repeal section 11149, and thus legalize lotteries. Section 2 of Article XIX of our Constitution provides: ''Legislative assembly shall have no power to authorize lotteries, or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state.'' If it is self-executing, it constitutes merely a declaration of broad public policy and is advisory, and if the legislature fails to act, no remedy is available to anyone. In other words, had the legislature failed to enact any provision concerning lotteries, then lotteries would be legal in this state despite the constitutional provision. No remedy would be available to anyone in that case, as mandamus will not lie to compel the legislature to enact any laws.

The general rule is that none of the provisions of the Constitution can be looked upon as merely advisory, and if the provision is capable of enforcement in *any manner*, it is to be regarded as self-executing. (1 Cooley, Constitutional Limitations, 8th Ed. 165.)

Our own court has spoken on this subject in *State ex rel. Bennett* v. *State Board of Examiners*, 40 Mont. 59, 104 Pac. 1055, 1058. The court said, ''The question in such cases [that is, whether or not a constitutional provision is self-executing] is always one of intention, and to determine the intent the general rule is that courts will consider the language used, the objects to be accomplished by the provision, and the surrounding circumstances, and, to determine these questions from which the intention is to be gathered, the court will resort to extrinsic matters when this is necessary.''

The majority misconstrues the wording of the constitutional provision. If the language of the constitutional provision were as the opinion of the court construes it to be, that is, if it read ''The legislature shall pass laws to prohibit lotteries and gift enterprises,'' there might be some merit to the view that the provision is not self-executing, although courts gen-

erally hold otherwise. Affirmative action of the legislature would be contemplated by such language but the constitutional convention did not use that language. Instead, the language in section 2 positively prohibits affirmative action on the part of the legislature. The section does go on to direct the legislature to take affirmative action in prohibiting the sale of lottery and gift enterprise tickets, but it expressly forbids any other legislative action.

Applying the test found in *State ex rel. Bennett* v. *State Board of Examiners,* supra, it is clear that the intention of the constitutional convention was to prohibit lotteries and gift enterprises, or rather to maintain the status quo, and the object to be accomplished by the provision was to do just that. Any other view makes the provision meaningless. The provision seeks to forbid lotteries by declaring the legislature shall not authorize them, and if an act purporting to do so were passed, would this court hesitate in applying the constitutional provision? But it here says the same result, i. e., authorized lotteries may be reached by inaction. To me this does not make sense. If the prohibition means anything, it means the result may not be accomplished in any way.

I think a correct test is announced by the majority in its adoption of what is said in 16 C. J. S., Constitutional Law, section 48, p. 98, but section 49 of 16 C. J. S. p. 101, shows the application of the general principles as announced by the majority to the specific constitutional provisions, such as we have here. Because it sums up so well the rule, I set it out here:

"Sec. 49. Prohibitions and Restrictions. A constitutional provision that is prohibitory and restrictive is self-executing unless it appears from the language used and the circumstances surrounding the adoption of the provision that legislation is contemplated in order that it may take effect.

"In determining when a constitutional provision is self-executing, there is a distinction between a declarative limitation of legislative power on a given subject, within which legislation

may or should be enacted, and positive constitutional inhibition which no legislative act can relieve or modify. As stated in Corpus Juris, it is a settled rule of constitutional construction that prohibitive and restrictive provisions are self-executing and may be enforced by the courts independently of any legislative action, unless it clearly appears from a construction of the language of the entire provision and the circumstances of its adoption that the enactment of legislation is contemplated as requisite to put it into effect. The scope and purpose of such provisions may not be restricted by adverse legislation; and all statutes then existing, or which may thereafter be passed inconsistent with them, are rendered null and void, in the absence of a savings clause in the constitution. Legislation, however, may be desirable and valuable for the purpose of enforcing the constitutional provisions, as, for example, by providing a penalty for their violation, and statutes passed for this purpose are valid.

"If a provision supplies the rule for enforcement and fixes a penalty for violation, it is not only self-executing, but also prohibitive; but a provision may be both prohibitive and mandatory and yet not self-executing.

"The absence of a penalty is one of the circumstances to be considered in determining whether a constitutional prohibition is intended to be self-executing, and it is a circumstance tending to support the view that the prohibition is not self-executing; but it is not sufficient of itself to postpone the operation of a provision which it appears from all the circumstances was intended to be self-operative.

"Fraud and gaming. Provisions designed to protect the public against fraud have been regarded as self-executing. While a provision that the legislature shall pass laws to prohibit the sale of lottery tickets has been regarded as a prohibition of lotteries and as self-executing, according to some cases a provision that the legislature shall pass laws to suppress gambling, or that gambling shall not be authorized or allowed within the state and the legislature shall pass laws to prevent offenses

against the provisions of this section, is not self-executing [citing *Beach* v. *Queens County Jockey Club,* 164 Misc. 363, 298 N. Y. Supp. 777; and *State* v. *Mustachia,* 152 La. 821, 94 So. 408], and, while the legislature may not, in view of such a provision, license gambling, yet until it penalizes any given act, there is no law under which its commission may be punished.''

A discussion of the two cases of *Beach* v. *Queens County Jockey Club,* supra, and *State* v. *Mustachia,* supra, appears later herein.

Applying that test to this provision of the Constitution of the state of Montana, the prohibition of lotteries and gift enterprises can be given effect without any additional legislation by way of injunction as is sought here. It seems to be clear also that so far as the prohibition of lotteries and gift enterprises is concerned, it is not to be questioned that the language of section 2 of Article XIX shows a ''manifest intention that they should go into immediate effect.''

As Cooley states the rule in Volume 1, at page 167, ''A constitutional provision may be said to be self-executing if it supplies a sufficient rule by which a right given may be enjoyed and protected, or the duty imposed may be enforced, and it is not self-executing if it merely indicates principles without laying down rules by which those principles may be given the force of law.'' That portion being cited and quoted with approval in *State* v. *State Board of Examiners,* supra.

*Hyatt* v. *Allen,* 54 Cal. 353, approved a holding in a case concerning section 1 of Article 13 of the California Constitution which provides that, ''All property in the State * * * not exempt under the laws of the United States, shall be taxed in proportion to its value, *to be ascertained as provided by law,* * * *'' that the provision was not self-executing. That holding is right without question, but it has no application here. The California provision clearly requires legislative action. Without legislative action no method of computing the tax would exist. By no stretch of the imagination could the general language

found in *People* v. *Settles,* 29 Cal. App. (2d) Supp. 781, 17 Pac. (2d) 274, relied on by the majority, be construed to support the proposition that their constitutional provision, similar to ours, is not self-executing. Neither is *State* v. *Mustachia,* 152 La. 821, 822, 94 So. 408, authority for the majority view. The Louisiana constitutional provision providing, ''Gambling is a vice and the Legislature shall pass laws to suppress it'' (Article 19, section 8.) That provision speaks in the future and indicates a plain intention on the part of the framers of the Constitution to state, first, the general principle that gambling is a vice, and, second, to command the legislature to take affirmative action in the future to define and suppress gambling. Our constitutional provision, on the contrary, shows clearly the convention considered that lotteries and gift enterprises were already prohibited and forbade the legislature from changing their status by the enactment of legislation permitting lotteries or gift enterprises.

The quotation from the decision in *Beach* v. *Queens County Jockey Club,* 164 Misc. 363, 298 N. Y. Supp. 777, 782, is misleading. That case instead of supporting the majority view is exactly contrary to it. The portion quoted by the majority is as follows: ''The provisions of the Constitution respecting gambling are not self-executing. Enforcing acts by the legislature are necessary.'' The opinion fails to give the balance of the paragraph which reads, ''An examination of such acts indicates a legislative intent that gambling at race tracks should not be considered in the same class as other forms of gambling. *It may be said that such gambling is unlawful but not punishable as a crime.*'' Were this a criminal action we too would be forced to hold that in the absence of the statute the proceedings must fail. And that was the sum and substance of what the New York court said in the paragraph last quoted. But this is an action to enjoin and the clear inference from the New York case is that since the gambling is unlawful under the Constitution, injunction would lie. In all this long discussion of the majority not a single case is cited holding a constitutional provision like ours not self-executing.

There are a great number of decisions holding that constitutional provisions directed to the legislature are self-executing but I will restrict myself to those that deal only with cases where the language of the Constitution in question is substantially the same as that found in ours. Many constitutional provisions are not self-executing but that does not make all constitutional provisions not self-executing. The Constitution of the State of Washington, Article 2, section 24, provides "The legislature shall never authorize any lottery * * *." In the *City of Seattle* v. *Chin Let,* 19 Wash. 38, 52 Pac. 324, the court said, "The language of the constitution is mandatory, and the provision is self-executing." There the legislature sought to exempt lotteries held for charitable purposes and the court held that it could not do so. While not dealing with lotteries the decision in *White* v. *White,* 230 Ala. 641, 162 So. 368, is squarely in point on the question of whether or not the constitutional provisions, such as we have here are self-executing. Article 4, section 35 of the Constitution of 1875 of the State of Alabama declares that "No act of the general assembly shall authorize the investment of any trust fund by executors * * * in the bonds or stock of any private corporation." The court held the constitutional provision self-executing.

Article 11, section 5, of the Constitution of the State of Tennessee provides, "The Legislature shall have no power to authorize lotteries for any purpose, and shall pass laws to prohibit the sale of lottery tickets in this State." In *Bass* v. *Mayor of Nashville,* 19 Tenn. 421, Meigs 421, 33 Am. Dec. 154, the provision was held to be self-executing. (See *City of Wink* v. *Griffith Amusement Co.,* 129 Tex. 40, 100 S. W. 2d 695; *Silberman* v. *Skouras Theatres Corp.,* 169 Atl. 170, 11 N. J. Misc. 907; *Dombrowski* v. *State,* 111 N. J. L. 546, 168 Atl. 722; *State* v. *Woodward,* 89 Ind. 110, 46 Am. Rep. 160.

It seems to me that our provision is analogous to the Fifteenth Amendment to the Federal Constitution which provides that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on

account of race, color, or previous condition of servitude. * * * Congress shall have power to enforce this article by appropriate legislation.'' Here we have, in the first part of the provision, a prohibition as is found in our constitutional provision, followed by an express direction to the Congress to enforce the article by appropriate legislation. The United States Supreme Court in *United States* v. *Reese,* 92 U. S. 214, 23 L. Ed. 563, has held the first portion of the amendment to be self-executing. (See, also, *Shipp* v. *Rodes,* 196 Ky. 523, 245 S. W. 157.)

As much reason can be found to argue that section 11 of Article III of our Constitution prohibiting the passage of laws impairing the obligation of contracts, or that the Fourteenth Amendment of the Federal Constitution are not prohibition as to so argue as to section 2, Article XIX.

In conclusion, it seems to me that the scheme in question is plainly a lottery under section 11149, Revised Codes and under section 2 of Article XIX of our Constitution; that section 2 of Article XIX contrary to the view of the majority is self-executing; that to hold as the majority has as to this latter point is to destroy by piecemeal our Constitution without even any justification of public need, changed conditions or to relieve injustice but instead to permit the legislature to authorize by repeal of section 11149 and other sections, lotteries and every other scheme such as the one here in question which are basically lotteries or gift enterprises.

MR. JUSTICE ANGSTMAN:

I concur in the dissenting opinion of MR. JUSTICE ERICKSON and desire to add the following:

The majority opinion correctly points out that the only noteworthy difference between this case and the *Dussault Case,* 110 Mont. 441, 101 Pac. (2d) 1065, is that here it was stipulated in effect that the money used to purchase the gift came from the rental of the store and office properties, and not from the sale of admission tickets. This is a distinction without a difference. If the rental goes to purchase the gift then the proceeds

from the sale of admission tickets must be used to discharge obligations that otherwise would be paid from the rental proceeds. Since this case is no different in fact or substance from the *Dussault Case*, it should be ruled by that case and the judgment here reversed.

The ultimate purpose and aim of the plan here involved is exactly the same as that in the *Dussault Case*, viz., to enhance the receipts from the sale of theatre tickets by appealing to the gambling instincts of the general public. The increased attendance at the theatre is all that is necessary to supply the element of consideration. (*Society Theatre* v. *City of Seattle*, 118 Wash. 258, 203 Pac. 21.) This the legislature fully realized and attempted in 1935 to make the law inapplicable to fairs and rodeos giving away cash and merchandise by public drawings. (Sec. 11149.1, Rev. Codes.) Whether that attempt was efficacious need not here be determined. The majority opinion makes the sweeping statement that the case of *Society Theatre* v. *City of Seattle*, just cited, turned upon a local ordinance completely eliminating the element of consideration. It is true that a city ordinance was involved prohibiting the sale or disposal of lottery tickets. The court was careful, however, to point out in its opinion that consideration was one of the elements necessary to prove a lottery, and in plain language held that there was a consideration because of the increase in attendance at the theatre because of the awarding of prizes. The fact that some have received the prize who were not in the theatre is of no importance. The lottery being established, the giving of some tickets without consideration is also prohibited. (Sec. 11151, Rev. Codes.) We are not advised by the agreed statement of facts whether some outside the theatre were denied the prize because of inability to arrive at the proper place within the proper time. Nor are we advised of the effect of such a situation. We can readily see that, the fact that when one draws the lucky number and is unable to report within the time because of remaining outside the theatre, will stimulate

the sale of tickets on succeeding Bank Nights so as to avoid repetition of that situation.

This case is a typical illustration of the activities of those who would attempt to do that which is prohibited—first proceeding in one way and then in another in achieving the same ultimate purpose and aim: with the hope of ultimately seizing upon some method that would meet the approval of the courts. When once approval of the practice is obtained, all those who had speculated in some other plan to evade the intent and purpose of the law would readily conform to the approved method. It was devices such as this which caused the court, in *Harvie* v. *Heise*, 150 S. C. 277, 148 S. E. 66, to make the following comment, which we quoted with approval in *State ex rel. Dussault* v. *Kilburn*, 111 Mont. 400, 109 Pac. (2d) 1113, 1115, 135 A. L. R. 99: "In no field of reprehensible endeavor has the ingenuity of man been more exerted than in the invention of devices to comply with the letter but to do violence to the spirit and thwart the beneficient objects and purposes of the laws designed to suppress the vice of gambling." I think rather than thus speculating on different modes to achieve the same end—an evasion of the laws—it would come with better grace for the theatres to seek legislative approval of some method to conduct a lottery after amendment of the Constitution was first had.

The most optimistic proponents of the scheme here involved will be amazed at the result of this case because now they may adopt either of two methods, if in fact there is any difference between them: either that here involved, or that used in the *Dussault Case,* and in addition to that have now found that the constitutional barrier against lotteries is meaningless and that by the simple expedient of procuring repeal of sections 11149 to 11158, all forms of lottery will be permitted in this state.

I think section 2 of Article XIX of the Constitution is plainly self-executing so far as to prohibit lotteries and gift enterprises. In other words, if the legislature had not acted at all, I think section 2 of Article XIX plainly prohibits lotteries and gift enterprises. That section reads: "The legislative assembly

shall have no power to authorize lotteries, or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state." By a play upon words, the majority have held that what the Constitution means is this: "The legislature shall have no power to authorize lotteries, or gift enterprises by the enactment of any laws authorizing them but it may accomplish that end by inaction." I do not agree with that line of reasoning.

Of course, before there could be any criminal prosecution a penalty must be provided by the legislature. This the legislature has done and it has also defined a lottery. Since the legislature has acted, and since the scheme here under consideration is, in my opinion, a lottery under the statutory provisions, I think discussion of the point as to whether section 2 of Article XIX is self-executing is not involved in the case.